Filed 7/20/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S075725 |
| v. | ) | |
| | ) | Los Angeles County |
| KIONGOZI JONES, | ) | Super. Ct. No. NA031990-01 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

A jury found defendant Kiongozi Jones guilty of two counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189),[1] one count of attempted murder (§§ 187, subd. (a), 664), one count of assault with a firearm (§ 245, subd. (a)(2)), and one count of shooting at an inhabited dwelling (§ 246). The jury found true allegations that defendant had personally used a firearm (all counts; §§ 1203.06, subd. (a)(1), 12022.5, subd. (a)); that the attempted murder had been willful, deliberate, and premeditated (§§ 189, 664, subd. (a)); that defendant, in committing attempted murder, had personally inflicted great bodily injury upon a human being (§ 12022.7, subd. (a)); and that defendant had previously been convicted of robbery (all counts; §§ 211, 667, subd. (a)(1), 667.5, subd. (b)). The jury also found true the special circumstance allegation that defendant had been convicted of multiple murders in the same proceeding. (§ 190.2, subd. (a)(3).)

---

[1] Further undesignated statutory references are to the Penal Code.

The jury fixed the penalty at death.  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I. BACKGROUND

In the span of a few minutes on the evening of December 6, 1996, four people — Mario Lopez, his sister Veronica Munguia, Angel Villa, and Nery Hernandez — were shot in the vicinity of an apartment building located at 1700 Pacific Avenue, in Long Beach.  Lopez was shot twice outside of the ground-floor apartment where Munguia and another sister lived.  Munguia was hit in the knee by a bullet that entered the apartment.  Villa was riding a bicycle near the intersection of 16th Street and the alley behind the apartment building, when a man grabbed him by the neck and shot him in the head.  The shooter then proceeded in the direction of Pine Avenue, where a car was backing out of a driveway.  The shooter approached the car and shot the driver, Hernandez, in the chest.  Lopez and Villa died, but Munguia and Hernandez survived.

Two police officers received a call regarding the shooting at 1700 Pacific Avenue and were told that two male African-American suspects were seen running toward Pine Avenue.  The officers stopped by 1708 Pine Avenue, which was near the crime scene and was a known hangout for members of the Crips gang.  The officers spoke to defendant and Melvin Sherman, among others.  A few days later, the police arrested defendant and Sherman, and the prosecution charged them with crimes pertaining to these events.

### A. Defendant's First Trial

Defendant and Sherman were initially charged jointly with two counts of murder (Lopez and Villa) and two counts of attempted murder (Munguia and Hernandez).  Lengthy pretrial proceedings not relevant to the issues presented on appeal resulted in dismissal of these charges.  Defendant was then charged

2

separately with, pleaded not guilty to, and was held for trial on two counts of murder (Lopez and Villa), one count of attempted murder (Hernandez), one count of assault with a firearm (Munguia), and one count of shooting at an inhabited dwelling. After Sherman was held to answer on related charges, the prosecution moved to consolidate defendant's case with Sherman's. The trial court denied this motion. Defendant's trial occurred in January 1998. The jury deadlocked and the court declared a mistrial.

## B. Defendant's Second Trial

After defendant's first trial, the trial court granted the prosecution's motion to consolidate defendant's case with Sherman's. The prosecution filed an amended information charging Sherman individually with one count of conspiracy to commit murder and defendant and Sherman jointly with two counts of murder (Lopez and Villa), one count of attempted murder (Hernandez), one count of assault with a firearm (Munguia), and one count of shooting at an inhabited dwelling. The prosecution sought the death penalty for defendant but not for Sherman. (Unless otherwise specified, all facts and analysis relate to defendant's second trial.)

### 1. Guilt Phase

The prosecution presented evidence showing that the shootings were part of an escalating gang war, with two African-American gangs, the Insane Crips and the Rolling 20's Crips, on one side, and a Hispanic gang, the Eastside Longos, on the other. Defendant "had been beaten up by someone just described as a Mexican," and the prosecution argued that the shootings were "payback of sorts." Defendant and Sherman spent part of the evening of December 6, 1996, at 1708 Pine Avenue, apartment 4. Within a span of about five minutes, they left the apartment, shot the victims, and returned. The prosecution contended that

3

defendant was the shooter, and Sherman aided and abetted him.  Defense counsel took the position that "[t]he sole issue in this case is identification," and, accordingly, principally sought to undermine witnesses' identifications of defendant as a perpetrator.

### a. Prosecution Case

### i. Background Gang Evidence

Detective Victor Thrash of the Long Beach Police Department testified that the Rolling 20's Crips and the Eastside Longos claimed the area around 1700 Pacific Avenue and 1708 Pine Avenue as their turf, and there was a "black–brown war that was going on within that specific area."  Officer Freaman Potter of the Long Beach Police Department, a gang expert, gave general background about gangs and gang culture.  He testified that the Insane Crips and the Rolling 20's Crips, two African-American gangs, and the Eastside Longos, a Hispanic gang, were among the largest and most violent gangs in Long Beach.  He testified that he recognized defendant as a member of the Rolling 20's Crips and explained the significance of defendant's tattoos, which appeared to be related to the Rolling 20's Crips.  Officer Potter said that if a member of the Rolling 20's Crips were "beaten down physically by a Hispanic gang member," he would have to respond or "the rest of the gang members would view [him] as weak."

Officer John Stolpe, Officer Michael Schaich, and Detective Steven Lasiter, all of the Long Beach Police Department, testified that they each separately had contact with defendant in April or May 1990 and, on those occasions, defendant told each of them that he was a member of the Rolling 20's Crips.  Defendant told Officer Stolpe that he used the moniker "Swoop."  Defendant told Officer Schaich that he used the moniker "Key Loc."  And defendant told Detective Lasiter that he used the moniker "Chicken Swoop."  Defendant had the words "Little 20 Swoop"

4

tattooed on the inside of his right forearm. Officer Potter testified that that "could be his gang name."

Officer Erik Herzog of the Long Beach Police Department testified that he spoke to Rosalind Gilyard, Sherman's mother, a week after the shootings. According to Gilyard, Sherman said he could not come to her neighborhood because there were a lot of Hispanic gangs, and he was a member of the Rolling 20's Crips. Gilyard testified that she told Officer Herzog that Sherman was a member of the Rolling 20's Crips, but she thought "he was younger when he was involved in that." Sherman showed the jury his tattoos — a "2" on the back of his left arm and a "0" on the back of his right arm.

### ii. Lopez and Munguia Shootings

#### (a) Amber Gutierrez

Amber Gutierrez was at 1700 Pacific Avenue, visiting the apartment where Lopez's sisters lived, on the evening of December 6, 1996. A group of people had gathered at the apartment. Gutierrez was a member of the Eastside Longos, but she did not think anyone else at the apartment was a member. She was on the couch, talking on the telephone, and a man walked by the front door toward the alley; she heard him talk to somebody else but could not hear what they were saying. Lopez walked outside, and Anna Granillo, one of his sisters, entered the apartment. Right after that, Lopez was shot; he stumbled inside the apartment and fell down. Other bullets entered the apartment; one struck a balloon and another struck Munguia, who had entered the living room to get her daughter after she heard the shots. Gutierrez identified Sherman as the man who had walked by the front door. She saw a glove and a gun, but she did not see the face of the person who fired the shots. Although Gutierrez had seen defendant in the neighborhood,

and he had previously "yell[ed] gang stuff" at her and her friends, she did not see defendant that evening.

### (b) Veronica Munguia

Veronica Munguia, one of Lopez's sisters, lived in an apartment at 1700 Pacific Avenue, and was home on the evening of December 6, 1996. She knew members of the Eastside Longos. Munguia was in the bedroom of the apartment when Granillo entered the bedroom; shots were fired shortly thereafter. Munguia ran into the living room to get her daughter; Lopez, who had been shot, pushed her daughter toward her. Munguia was hit in the knee by a bullet that came through the wall, and she ran back into the bedroom. Lopez collapsed in the hallway of the apartment after being shot. Munguia did not see who did the shooting.

### (c) Anna Granillo

Anna Granillo, Lopez and Munguia's sister, lived with Munguia at 1700 Pacific Avenue, and was home on the evening of December 6, 1996. That day, she had made several trips between the apartment and a nearby laundry room, doing laundry and returning to the apartment to fold and hang up clothes. On her last trip from the laundry room, around 7:00 p.m., she saw Lopez outside the apartment and two men by the alley. She told Lopez to " 'watch out' " and walked into the apartment with her laundry, "and that's when they started shooting." She identified defendant and Sherman as the men she saw by the alley before the shooting began, but she did not see the shooting.

### iii. Villa and Hernandez Shootings

### (a) Maria Jaramillo

Maria Jaramillo was at home at 126 West 16th Street on the evening of December 6, 1996. She was outside playing with her nephews when she heard gunshots. She took her nephews inside, then went back outside. She observed a

6

man, whom she identified as defendant, walk out of an alleyway in the direction of Pine Avenue. Another man went by on a bicycle from the direction of Pacific Avenue; defendant grabbed him by the neck and shot him in the head. She saw defendant proceed toward a car that was backing out of a driveway; she went back inside, heard more shots, went outside, and saw the two victims of the shootings, Villa and Hernandez.

### (b) Nery Hernandez

Nery Hernandez testified that he lived at 1601 Pine Avenue, and was leaving his house with his family shortly before 7:00 p.m. on December 6, 1996. He backed his car out of his driveway and got out to close the gate. He saw a Hispanic man on a bike and an African-American man, whom he identified as defendant, about 10 or 15 feet away; they looked like they were arguing. He saw defendant point a gun at the Hispanic man, and he heard one or two shots. He got back into the car and tried to leave, but could not because there was a car behind him; when he turned back around, defendant was standing in front of the car, pointing a gun at him. Defendant fired, and Hernandez was struck in the chest. Hernandez saw defendant run toward Pine Avenue.

### iv. Subsequent Investigation

Officer Peter Anderson of the Long Beach Police Department testified that he and his partner, Officer Ernie Kohagura, responded to a report of a shooting at 1700 Pacific Avenue, shortly before 7:00 p.m. on December 6, 1996. The radio dispatch stated that two male African-American suspects had been seen running eastbound toward Pine Avenue. Because other officers had secured the crime scene, and believing the shooting may have been gang related, Officers Anderson and Kohagura went to 1708 Pine Avenue, a nearby hangout for members of the Crips. Defendant was standing outside the front door of apartment 4. After

7

defendant saw the officers, who were in uniform, he quickly turned and went inside the apartment. The officers went to the apartment, conducted a protective sweep, spoke to the occupants, and filled out field identification cards on defendant and Sherman. Officer Kohagura testified and gave a similar account.

Detective William Collette of the Long Beach Police Department, one of the lead investigators, testified regarding the crime scenes, the locations of the victims, and the collection of shell casings that were found.

Detective Thrash testified that he interviewed Leslie Rainey, a friend of defendant's and Sherman's, a week after the shootings. Rainey used the nicknames "Swoop" and "Baby Troub" when referring to defendant and Sherman, respectively. He said that he was at 1708 Pine Avenue, apartment 4, with defendant, Sherman, and four women on the evening of December 6, 1996. Rainey told Detective Thrash that defendant and Sherman had left for about five minutes and returned together, and defendant had said " 'something must have happened out there outside because there are a lot of police.' " Rainey also said "Swoop [defendant] was mad cause he was beat down . . . by a Mexican earlier that week."

Rainey also testified that he was at 1708 Pine Avenue, apartment 4, with defendant, Sherman, and four women on the evening of December 6, 1996. They were planning to watch the television show *Martin*, which played at 6:00 p.m. and 6:30 p.m. Defendant stepped just outside the apartment for about five minutes and came back inside to watch the show. The broadcast of *Martin* was interrupted by news of the shootings. Officers Kohagura and Anderson showed up to talk to them about the shootings, and Rainey was interviewed a week later by detectives. Rainey denied ever having told the police that defendant and Sherman left together for five minutes. He also denied telling Detective Thrash that defendant had said " 'he had a fight with some Mexicans.' "

8

Detective Craig Remine of the Long Beach Police Department, one of the detectives assigned to the case, testified that he checked the distance between the scenes of the shootings. He said it took him about 55 seconds to walk the distance between the three locations and about 30 seconds to jog it.

Dale Higashi, a senior criminalist with the Los Angeles County Sheriff's Department, testified that he examined eight .40-caliber shell casings that were collected from the scenes of the shootings. In his opinion, all of the shell casings came from the same semiautomatic pistol. He neither possessed nor examined the pistol from which the bullets were fired.

Dr. Suko Jack Whang, a deputy medical examiner with the Los Angeles County Coroner's Office, testified that Lopez had been struck by two bullets. One of the bullets struck Lopez in the chest and lacerated his heart, killing him.

Dr. Thomas Gill, a forensic pathologist with the Los Angeles County Coroner's Office, testified that Villa died of a gunshot to the right eye, which entered the brain.

### b. Defense Case

#### i. Gregory Sinsun

Gregory Sinsun testified that he was with Granillo and others in the bedroom of the apartment at 1700 Pacific Avenue on the evening of December 6, 1996. Granillo was in his presence during the shooting, and he did not see her moving her laundry around at that time.

#### ii. Officer William Jarman

Officer William Jarman of the Long Beach Police Department testified that he interviewed Granillo on the night of December 6, 1996. Granillo told Officer Jarman that she was in the bedroom of the apartment, "heard several loud gunshots," "dropped to the floor," and "never left that bedroom." Officer Jarman

9

also interviewed Sinsun the same night, and he said he was in the bedroom with Granillo that night, "heard several loud shots and dropped to the ground and never left the bedroom."

### iii. Robert Elder

Robert Elder was unavailable to testify at defendant's second trial, and the trial court permitted defendant to introduce the testimony Elder gave during defendant's first trial. Elder was Hernandez's upstairs neighbor, and he was at home on the evening of December 6, 1996. He heard three gunshots and went to a window, where he saw a stocky man with a large afro shooting down the street with a "long gun," "a .45," "like Clint Eastwood had." The man walked down 16th Street toward Pine Avenue, got into a car with two other people, and drove off. Elder did not see the man's face, and from his vantage point, he could not see the shooting victims. After the man left, Elder went outside and saw that Villa and Hernandez had been shot. Elder further stated that he did not recognize defendant from a photo lineup that defense counsel had previously shown him.

### c. Jury Verdict

On July 31, 1998, the jury found defendant guilty of two counts of first degree murder (Lopez, count 2; Villa, count 3; §§ 187, subd. (a), 189), one count of attempted murder (Hernandez, count 4; §§ 187, subd. (a), 664), one count of assault with a firearm (Munguia, count 5; § 245, subd. (a)(2)), and one count of shooting at an inhabited dwelling (count 6; § 246). With respect to each count, the jury found true the allegation that defendant had personally used a firearm. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) With respect to count 4, the jury found true allegations that the offense had been willful, deliberate, and premeditated (§§ 189, 664, subd. (a)) and that defendant had personally inflicted great bodily injury upon a human being (§ 12022.7, subd. (a)). With respect to

10

counts 5 and 6, the jury found not true the allegation that defendant had personally inflicted great bodily injury upon a human being.  (*Ibid.*)  Finally, the jury found true the special circumstance allegation that defendant had been convicted of at least one count of first degree murder and one or more counts of first or second degree murder in the same proceeding (i.e., the multiple-murder special circumstance).  (§ 190.2, subd. (a)(3).)[2]

### 2. Penalty Phase

#### a. Aggravating Evidence

During the penalty phase, the prosecution introduced evidence that defendant had been involved in six prior uncharged criminal incidents:  (1) the April 1990 attempted murder of Matthew Ferguson and Quincy Sanders; (2) carrying a concealed weapon, a loaded revolver, in June 1990; (3) the June 1990 robbery of Sarom Sao at gunpoint; (4) the August 1990 murder of Carl Milling; (5) the May 1991 attempted murder and assault with a firearm of Artis Lisby; (6) and the September 1991 murder of Ronald Broussard.  The prosecution also introduced evidence that defendant had pleaded guilty in 1992 to the robbery of Charles Loch, for which he received a three-year prison sentence.

The prosecution also presented victim impact evidence.  Anna Munguia, Lopez's mother, went to the hospital with Lopez after he was shot and was there when he died.  She testified that Lopez's death "hurts a lot."  He "got along with

---

[2]     The jury found Sherman not guilty of conspiracy to commit murder (count 1; § 182, subd. (a)(1)) and guilty of counts 2 through 6, as recited above.  The prosecution did not seek the death penalty for Sherman.  The Court of Appeal affirmed Sherman's judgment of conviction, and we denied review.  (See *People v. Sherman* (June 23, 2000, B128330) [nonpub. opn.], review den. Aug. 30, 2000, S090284.)

everybody" and was not involved in gangs like his brothers. Margarita Rodriguez, Villa's widow and the mother of his children, identified Villa's body after he was killed. She testified that he was a "very good" person, and Villa's death affected their four children "a lot." Inez Villa Uriarte, Villa's sister, testified that Villa was the best of her brothers and was a loving father. She helped to take care of Villa's children after his death. The children were very affected by the loss of their father.

### b. Mitigating Evidence

Defendant presented testimony from 13 witnesses as mitigating evidence. They testified that defendant's father had drug and alcohol problems, which "messed [defendant] up" and caused defendant to lose respect for his father. Defendant was raised mostly by his mother and grandmother, who took good care of him, but his father was also around until defendant was in high school. Defendant is the youngest of seven children, and most of his siblings had spent significant time in prison. Defendant was not a disobedient child, but "went the wrong place at the wrong time" and spent some time in prison. Defendant was a kind, respectful, fun-loving person and a good father to his four children, and he was trying to get his life together. Several witnesses were unaware of defendant's gang membership. Not long before the shootings, defendant sought employment with a community outreach program that hired former gang members and tried to prevent gang violence. An employee of that organization believed defendant was no longer an active gang member.

### c. Jury Verdict

On August 13, 1998, the jury fixed the penalty at death. At the same time, the jury also found true the allegation that defendant had been previously

12

convicted of robbery, a sentencing enhancement that had been bifurcated from the guilt phase. (§§ 211, 667, subd. (a)(1), 667.5, subd. (b).)

### 3. Posttrial Proceedings

Defendant filed a motion for a new trial, claiming, among other things, insufficiency of the evidence, prosecutorial misconduct, and ineffective assistance of counsel, which the trial court denied. The trial court also denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and imposed a judgment of death. This automatic appeal followed.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Restriction of Cross-examination

Defendant argues that the trial court improperly prevented him from cross-examining Munguia, Granillo, and Detective Collette about the fact that Granillo came forward and identified defendant and Sherman only after the prosecutor told Munguia that the "case against [defendant] was weak, and that without an eyewitness to identify him, [he] would likely 'walk.' " He contends that the jury was deprived of evidence of "Granillo's strong motive to fabricate, [which] would thus have severely undermined the credibility of her testimony." We find any error harmless beyond a reasonable doubt.

##### a. Background

When interviewed by the police on the night of December 6, 1996, Granillo said she was in the bedroom of the apartment at the time of the shootings and could not identify anybody involved. She did not talk to anybody else about the case for more than a year. On December 8, 1997, after jury selection in defendant's first trial had begun, Patrick Connolly, who was then the prosecutor, spoke to Munguia about "how the case looked and what the evidence was." He

13

asked for her help in locating witnesses, because "there was a possibility that the defendant would be walking out the door at the end of this trial." Munguia called Connolly that night and told him that Granillo had seen "two male blacks enter the apartment complex." Granillo contacted Connolly and gave a statement to Detective Remine, in which she identified defendant and Sherman as having been in the alley behind the apartment building right before the shootings occurred. (She ultimately testified to that effect in both trials.)

### i. Defendant's First Trial

At defendant's first trial, the trial court ruled that testimony regarding Munguia's conversation with Connolly would be excluded as hearsay. "What I want to exclude is the conversation between Mr. Connolly and Miss Munguia. You can certainly — and put this in context as well. That late in these proceedings, she informed the — I believe Mr. Connolly that Miss Granillo had something to say. And then when Miss Granillo is called to testify, you can then question her concerning her motivation for changing her testimony or statement or adding to her testimony or statement as previously given. You can cross-examine her concerning that."

During cross-examination, Munguia testified that she provided Connolly with Granillo as a witness. Defense counsel then asked, "What were the circumstances that brought about you notifying the district attorney with Anna Granillo's information?" Consistent with its earlier ruling, the trial court sustained the prosecution's objection to the question as calling for hearsay, namely, the out-of-court statements Connolly made to Munguia. The court permitted defense counsel to ask Munguia whether she had had an interview with Connolly and provided Granillo as a witness only after that interview. Munguia answered in the affirmative.

14

On cross-examination, Granillo testified that she had lost her memory of the shootings until about a week before she came forward as a witness. She talked to Munguia around December 8, 1997, and learned that Munguia had met with Connolly. At a sidebar, defense counsel stated, "I am going to ask [Granillo] . . . if [Munguia] told her that [Connolly] told her about the case. . . . I am going to ask . . . exactly what [Munguia's] words were. That [Connolly] thought the case was weak and needed additional witnesses. I am going to make the connection. That's why her memory came back." The prosecution objected on hearsay grounds. Consistent with its earlier ruling, the trial court allowed defense counsel to ask Granillo whether Munguia had told her to come forward and testify, "as long as it is not a repetition of the statement by Mr. Connolly." Defense counsel then asked Granillo whether, as a result of Munguia's conversation with Connolly, Munguia informed her that the prosecution needed her testimony. Granillo responded that she told Munguia the truth about what she saw, and Munguia asked her to tell the prosecution the same thing.

### ii. Defendant's Second Trial

Defendant's second trial began almost six months after defendant's first trial ended. A different prosecutor, Steven Schreiner, tried the case. The trial court did not enter an advance ruling regarding Munguia's conversation with Connolly, as it had in the first trial. Before Munguia testified, and outside of the presence of the jury, Schreiner stated: "She [Munguia] and, I believe, Anna Granillo, the next witness, are going to be attacked as essentially concocting and bringing in Miss Granillo late into the proceedings through Mr. Connolly. I have subpoenaed Mr. Connolly. [¶] Depending on how far we go into that — I know there were discussions at the previous trial about hearsay and the conversations

15

and all of that. So depending on what takes place there, I may have to bring in Mr. Connolly to rebut that."

On cross-examination, Munguia testified that she had had a conversation with Connolly on December 8, 1997, and "[a]s a result of that conversation [she] had with the district attorney, . . . [she was of the] state of mind that [she] needed to obtain an additional witness." Defense counsel followed up, "Is it also true that as a result of that conversation with Pat Connolly, the district attorney, on December 8th, 1997, that you were of the state of mind that the reason that you needed an additional witness was because the case was weak, correct?" The prosecution objected to the question as "calling for speculation," and the trial court sustained the objection. Defense counsel did not rephrase the question, but asked two more questions, eliciting testimony that Munguia spoke with Granillo after her conversation with Connolly, and then Granillo came forward. On redirect examination, Munguia testified that she asked Granillo to talk to Connolly about what she knew, but did not "force her or make her say anything" in particular. On recross-examination, Munguia testified that Connolly asked her if she could help him in the case. Defense counsel followed up, "It is true that he also informed you that he needed additional witnesses, correct?" The prosecution asked to approach the bench, the trial court overruled any objection, and Munguia answered in the affirmative.

On cross-examination, Granillo testified that around December 8, 1997, she found out from Munguia that defendant's first trial had started. Granillo learned that Munguia had met with Connolly. As a result of that conversation, Munguia asked Granillo to call Connolly. Granillo did call Connolly and gave a statement implicating defendant and Sherman. Defense counsel did not ask Granillo about the details of Munguia's conversation with Connolly.

16

Six days later, Detective Collette testified.  On cross-examination, Detective Collette testified that he was present when defense counsel interviewed Munguia.  He heard Munguia state that she had had a conversation with Connolly and that as a result of the conversation, she "felt obligated to find additional witnesses," after which point she spoke to Granillo.  Defense counsel asked Detective Collette what Munguia said about why she felt obligated "as a result of the conversation she had with [Connolly] regarding the evidence in this case." The prosecution requested a sidebar.  Defense counsel stated that she intended to ask whether Detective Collette heard Munguia say that "Connolly told her that this was a weak case and, unless they get additional witnesses, that [defendant] would be walking out the door."  Defense counsel initially suggested this line of questioning was relevant to Detective Collette's state of mind.  She stated that this line of questioning went to "the fact as to why Veronica Munguia went to [Granillo] and it brings up that whole thing.  She told [Granillo] that this is a very weak case, we need somebody to come forward.  [Granillo] says, 'Okay, I saw everything.'  It goes to that, your honor."  The trial court noted that "the person to ask about that is Anna Granillo, not the detective, not this detective."  The prosecution argued that the testimony sought was "impermissible hearsay."  The trial court ruled:  "I am not going to permit any questions of this witness concerning an opinion offered by Mr. Connolly concerning the strengths or weaknesses of the case. . . .  [¶] . . . [¶]  You can ask him about his interview with Miss Granillo and the rest of that, as long as we don't get into eliciting any opinion about the case from Pat Connolly."

b.  *Discussion*

Defendant argues that the trial court erroneously excluded as hearsay evidence of Munguia's conversation with Prosecutor Connolly — in which

17

Connolly said the evidence against defendant was weak and that defendant might "walk" at the end of the trial if more witnesses were not located. Defendant contends that evidence of this conversation was nonhearsay, because it explained Munguia's state of mind in calling Granillo, and, more importantly, Granillo's state of mind and motive to lie when she stepped forward on the eve of trial, changed her story, and identified defendant as being in the alleyway moments before the shootings at 1700 Pacific Avenue occurred.

The Attorney General does not dispute that Connolly's statement to Munguia about the strength of the case against defendant could plausibly have been admitted for legitimate nonhearsay purposes. He thus concedes that the trial court might have erred in defendant's first trial by sustaining the prosecution's hearsay objections to Munguia's and Granillo's testimony about Connolly's statement. But, the Attorney General argues, the trial court committed no comparable error in defendant's second trial.

The Attorney General observes that the prosecution did not raise hearsay objections to defense counsel's questioning of Munguia and Granillo about Munguia's conversation with Connolly. The prosecution instead objected to the question defense counsel posed to Munguia — whether she was "of the state of mind that the reason that [she] needed an additional witness was because the case was weak" — as calling for speculation. The trial court sustained the objection on that basis, and defense counsel did not rephrase the question or pursue the matter further. And in her cross-examination of Granillo, defense counsel never sought to elicit the details of Munguia's conversation with Connolly. The Attorney General thus contends that defendant has forfeited his claim of error with respect to Munguia and Granillo. (See Evid. Code, § 354.) The Attorney General further argues that the trial court's ruling with respect to Munguia was not an abuse of discretion, because the question called for Munguia's lay opinion on the strength

18

of the evidence, of which Munguia had no personal knowledge, which would have not assisted the jury, and which is an improper subject of lay opinion testimony in any event. (See *id.*, § 800; *People v. Rodriguez* (2014) 58 Cal.4th 587, 631; *People v. Thornton* (2007) 41 Cal.4th 391, 429.) Finally, the Attorney General argues that the trial court correctly excluded Detective Collette's testimony regarding what he overheard Munguia say about her conversation with Connolly, because his state of mind was irrelevant, and the testimony would have been inadmissible multiple hearsay. (See Evid. Code, § 1201.)

Defendant, for his part, argues that he has preserved his claim of error. He notes that the same judge presided over both trials, the admissibility of Connolly's statement to Munguia was a significant point of contention in both trials, and thus the "substance, purpose, and relevance of [Munguia's conversation with Connolly] was made known to the court." (Evid. Code, § 354, subd. (a).) Furthermore, defendant contends that the trial court's rulings demonstrated that the court was excluding the evidence as hearsay and, thus, any further attempts to introduce it would have been futile. (*Id.*, subd. (b).) He also disputes that defense counsel's question to Munguia called for speculation. Defendant does not renew his argument in the trial court that Detective Collette's testimony about the conversation was admissible to show Detective Collette's state of mind, nor does he specifically argue that the trial court's exclusion of Detective Collette's testimony was an abuse of discretion under the Evidence Code. But defendant does argue that the trial court's restriction of cross-examination of Munguia, Granillo, and Detective Collette deprived him of his constitutional rights to confront adverse witnesses, to present a defense, to a fair trial, and to a reliable penalty determination.

We need not unravel these competing arguments, because any restriction of cross-examination was harmless beyond a reasonable doubt, satisfying both

19

federal and state standards of harmlessness. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1951) 46 Cal.2d 818.) Defendant claims that the trial court's restriction of cross-examination was not harmless because the jury was deprived of evidence that "was critical to impeach Granillo's testimony that her statement on the night of the crime was false" and her reasons for coming forward with " 'the truth,' a full year later, just as the case was going to trial." We disagree. The jury heard Munguia testify that Connolly told her he needed more witnesses; that she tried to get her brother Arthur to come forward, but he refused; and that after she talked to Connolly, she also spoke to Granillo, who then called Connolly and changed her story about what she had seen. Granillo admitted that she initially lied about not seeing anything on December 6, 1996, and she testified that she did so because she feared retaliation and did not want to go through "the memory of the loss of [Lopez] again." Defense counsel elicited testimony from Granillo that she did not tell anybody about seeing defendant and Sherman on the night of the shootings until she learned from Munguia that defendant's first trial was starting, and that she would not have called Connolly if she had not spoken to Munguia. Detective Collette also testified that he heard Munguia say she felt obligated to find additional witnesses after she spoke to Connolly, and only after that conversation did Granillo come forward and give a different account. Based on this evidence, defense counsel explicitly invited the jury to make the reasonable inference that Connolly told Munguia "obviously, we need additional witnesses. This is a weak case. We don't get additional witnesses, Mr. Kiongozi Jones, he is going to walk." Defense counsel introduced considerable evidence that tended to impeach Granillo with respect to her inconsistent statements and reasons for coming forward; introducing Connolly's precise words to Munguia would have added little, if any, additional value. Any erroneous restriction of cross-examination was harmless beyond a reasonable doubt. (See *Delaware v. Van*

20

*Arsdall* (1986) 475 U.S. 673, 684; cf. *People v. Brady* (2010) 50 Cal.4th 547, 560–561.)

### 2. *Exclusion of Robert Robinson's Testimony*

Defendant argues that the trial court erroneously prevented him from introducing testimony from Robert Robinson during the guilt phase to the effect that defendant was no longer an active member of the Rolling 20's Crips at the time of the shootings. We find that the trial court did not abuse its discretion in excluding Robinson's testimony.

#### a. *Background*

At a hearing held outside of the presence of the jury under Evidence Code section 402, Robinson testified to the following. Robinson worked as a gang prevention outreach counselor for an organization that worked closely with the Long Beach Police Department. Defendant had sought a job with the organization, and the organization wanted to hire him, as a former gang member, to work with children in an outreach program. The organization screened applicants to find out whether they were, in fact, no longer active in a gang. Robinson believed defendant was no longer active in the Rolling 20's Crips, based on defendant's statement that he was no longer active in the gang; discussions with unspecified gang members and others in the community; and his observations of defendant, which suggested to Robinson that defendant's "mind was in a different place."

The prosecution objected to the admission of Robinson's testimony. The trial court acknowledged that Robinson's testimony was relevant to counteract the prosecution's evidence that defendant was a gang member. It found, however, that the first two bases for Robinson's opinion — defendant's own statements and Robinson's discussions with other people — were inadmissible hearsay. The trial

21

court precluded Robinson from testifying during the guilt phase about his belief that defendant was no longer an active gang member because the only remaining nonhearsay basis for this opinion — his observations of defendant — was insufficient.**3**

b. *Discussion*

At trial, defendant argued that Robinson could testify about his discussions with defendant and others regarding defendant's past gang membership because those discussions were admissible for a nonhearsay purpose — to prove Robinson's state of mind. The trial court found such testimony inadmissible for that purpose because Robinson's state of mind was not at issue, and defendant does not take issue with this ruling on appeal. The trial court recognized that Robinson's own observations of defendant were admissible. But it precluded Robinson from testifying that defendant was no longer an active gang member because "the jury would be misled if they were — because of the hearsay problem, if they were to hear from Mr. Robinson, that the only basis about which he could testify would be the personal observations, and that that would not give a complete record or complete information about Mr. Robinson's opinion."

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." (*People v. Leon* (2015) 61 Cal.4th 569, 601; see Evid. Code, § 800.) "By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1308.) The trial court found that Robinson's discussions with defendant, gang members, and others in the community were significant to his

---

**3**     Robinson did testify during the penalty phase.

opinion that defendant was no longer a gang member, and that his personal observations of defendant were a "confirming factor" which were not, on their own, a sufficient basis for his opinion. As a result, it had discretion to exclude Robinson's opinion. (See Evid. Code, § 803 ["The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion."].) Defendant offers no reason why the trial court's ruling on the matter was an abuse of discretion, and we find none.

Instead, on appeal, defendant shifts the focus of his arguments. Defendant first contends that Robinson should have been permitted to testify as a gang expert and offer his expert opinion that defendant was no longer an active member of the Rolling 20's Crips. If Robinson had been qualified as an expert witness, defendant argues, he would have been permitted to testify as to his opinion even if it was based on inadmissible hearsay, such as his out-of-court discussions with defendant and others. (Evid. Code, § 801; *People v. Sanchez* (2016) 63 Cal.4th 665, 675–679, 685–686.)[4] But defendant admits that "Robinson was not formally

---

[4] Defendant argues that Robinson should have been permitted to give his expert opinion that defendant was no longer an active gang member and relate the basis of such opinion to the jury, even if the opinion was based on otherwise inadmissible hearsay. Defendant relies in significant part on *People v. Gardeley* (1996) 14 Cal.4th 605, 619, in which we held that a gang expert "could reveal the information on which he had relied in forming his expert opinion, including hearsay."

After briefing concluded in this case, we decided *People v. Sanchez*, *supra*, 63 Cal.4th 665, in which we disapproved *Gardeley* "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, at p. 686, fn. 13.) In *Sanchez*, we explained that an expert witness is permitted to "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he [or she] did so." (*Id.* at p. 685; see also *id.* at pp. 674–679.) But we held that "[i]f an expert testifies to case-specific out-

*(footnote continued on next page)*

23

qualified as [a] gang expert," and there is nothing in the record to suggest that defendant sought to have Robinson testify as a gang expert. On the contrary, defendant expressly recognized that Robinson was a lay witness. In the trial court, defense counsel argued that Robinson should have been permitted to testify regarding defendant's statements to Robinson because Sherman's mother was permitted to testify that Sherman told her he was a member of the Rolling 20's Crips: "The People were allowed to put [Sherman's] mother, *a lay person, same as Mr. Robinson*, on the stand and ask his mother, . . . 'Are you aware that he's a gang member?' 'Yes.' 'Did he tell you that?' 'Yes.' " (Italics added.) Defense counsel explained, "I'm offering the same thing." Defendant may not assert on appeal that Robinson was qualified to testify as a gang expert when he did not urge that theory of admissibility in the trial court. (See Evid. Code, § 354, subd. (a); *People v. Valdez* (2004) 32 Cal.4th 73, 109 [we will not address the merits of a new theory of admissibility "based on a hypothetical offer of proof"].)

Defendant also argues that Robinson's opinion that he was no longer a gang member was admissible as evidence of his reputation in the community. Again,

_____

*(footnote continued from previous page)*

of-court statements to explain the bases for his [or her] opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. [Fn. omitted.] Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684.)

Because we conclude that defendant did not offer Robinson as an expert witness at trial and the trial court properly excluded Robinson's opinion testimony during the guilt phase, we need not consider the application of *Sanchez* to Robinson's out-of-court discussions with defendant and others regarding defendant's past gang membership.

there is nothing in the record to suggest that defendant sought to introduce Robinson's testimony or opinion as character evidence. In arguing against the admission of Robinson's testimony, the prosecution recognized that "clearly, the Evidence Code does allow a defendant to put his own character in issue, but then, it allows [the prosecution] to respond to that." Later, the prosecution stated: "Now, if it's going to character, that's one thing. But if we're talking about character, then let's call it that, and then allow me to respond." (See Evid. Code, § 1102; *People v. Wagner* (1975) 13 Cal.3d 612, 618 ["when the defendant . . . has injected the issue of his *good moral character* into the case by direct testimony, the prosecution may rebut by introducing evidence of the defendant's bad moral character"].) By not asserting in response that he wanted to introduce Robinson's testimony and opinion as evidence of his good character — and, thus, to open himself up to evidence of his bad character — defendant has forfeited this argument. (See Evid. Code, § 354, subd. (a); cf., e.g., *People v. Panah* (2005) 35 Cal.4th 395, 481.)

Defendant argues that excluding Robinson's testimony denied him his constitutional rights to present his defense, to a fair trial, and to a reliable guilt and penalty determination. The trial court's exclusion of Robinson's testimony, which was not an abuse of discretion under the Evidence Code, did not amount to a deprivation of defendant's constitutional rights. (*People v. Jones* (2013) 57 Cal.4th 899, 957; *People v. Riccardi* (2012) 54 Cal.4th 758, 809; *People v. Boyette* (2002) 29 Cal.4th 381, 413.)

3. *Introduction of Tape Recording*

Defendant argues that the trial court erred in permitting the prosecution to play for the jury a recording of a telephone call between defendant and his brother

that took place a few days after defendant's first preliminary hearing. We find no error.

*a. Background*

Two days after defendant's first preliminary hearing, while defendant was in jail, he placed a telephone call to an unidentified woman. The woman initiated a three-way connection to a person named Tony, later revealed to be defendant's brother, Tony Frazier. Deputy Sheriff Dale Lovvik monitored and recorded the call for reasons unrelated to this case. Parts of the recording are difficult to understand; the prosecution prepared a transcript of the call, and the trial court interlineated a few corrections to the transcript after it listened to the tape. In the tape recording, defendant and Frazier discussed what happened at the preliminary hearing, before moving on to discuss Frazier's parole status and other matters. Selected portions of the transcript of the recording follow:[5]

"[Frazier]: What's up man? I've been waiting on you to call.

"[Defendant]: Uh uh. What you guys doing?

"[Frazier]: Nothin. I talked to Troub man and I'm trying to get a hold of the dude so I can find out what happended in there.

"[Defendant]: Huh.

"[Frazier]: Who was it? Why did they detain you.

"[Defendant]: Oh I don't know. Oh you talkin my homeboy little Troub?

"[Frazier]: The one you both here.

---

**5** Although the transcript of the tape recording was not introduced as evidence, both sides quote from it in their briefs. We also use the transcript as the source of quoted material. All text appears as it does in the original transcript.

26

"[Defendant]:  Oh, they sick man.  I don't know cuz.[6]  They pointed cuz out and kept me man.[7]  [¶] . . . [¶]

"[Frazier]:  Okay now, who who said something . . . Who is this person, a lady?

"[Defendant]:  Two ladies and uh uh and uh dude, but they ain't sayin shit.  They ain't sayin nothin.  I thinkin they got help.  The Judge said no doubt in his mind that he think I'm guilty of the crimes.  They pointed the homeboy out.

"[Frazier]:  Ah ug.

"[Defendant]:  Talk about he walk by the door and looked in and uh why did two minutes after that they'd seen the glove and gun comin how they seen no hand and nothin, saw a blast, way out . . . . . . but they dropped that murder.  Now they got me for a murder in the attempt and everybody got shot with the same gun.  It don't make no sense, you know you drop one and

---

**6**        Officer Potter testified that "cuz" "is a term that is used with Crips, specifically Crips, recognizing another Crip."  Frazier testified regarding the meaning of cuz:  "Well, you can take it in two different ways.  Gang members use it for Crips, they use it.  But if you — I was born and raised in Long Beach.  If you live in this area, everybody says the word.  Ain't nobody going to say blood or brother.  Because if you're not a gang member and you say blood or brother, they gonna jump you.  So everybody get used to saying the word 'cuz.'  It's a slang."

**7**        At the preliminary hearing, Gutierrez testified that she saw Sherman walk by shortly before the shooting began.  Jaramillo initially identified Sherman as the person who shot Villa, but, after some confusion, corrected herself and identified defendant as the shooter.  Hernandez testified that defendant "look[ed] very much like" the person who shot him and Villa.  At the end of the hearing, the trial court dismissed all of the charges against Sherman.  The trial court dismissed one count of murder (Lopez) and one count of attempted murder (Munguia) against defendant but ordered defendant held to answer on one count of murder (Villa) and one count of attempted murder (Hernandez).  The prosecution later filed a new complaint, and defendant was held to answer on all of those charges.  (See *ante*, pt. I.B.)

"[Frazier]:  They got you on one.

"[Defendant]:  They got me on one murder and an attempt.

"[Frazier]:  Now who.  How did they get you on this one if they ain't got nobody?

"[Defendant]:  I don't know cuz.  I don't know.

"[Frazier]:  Well who are these people?  Get the transcripts.

"[Defendant]:  Yeah, I fixin to tell my lawyers man

"[Frazier]:  Okay.

"[Defendant]:  But he said he fixen to go out there and investigate.  You know I ain't got, I ain't do this cuz, they ain't go.

"[Frazier]:  I know.

"[Defendant]:  Don't even worry about it.

"[Frazier]:  Uhh.

"[Defendant]:  Don't even worry about it.

"[Frazier]:  Man I'm worried about it man.  I know how the folks is.

"[Defendant]:  Yeah.

"[Frazier]:  I ain't just.

"[Defendant]:  Nigger need that DA hit that's who the nigger need hit.[8]

"[Frazier]:  Yeah, but you know, you know

"[Defendant]:  You know that's what I'm thinkin fool.  He's mad because he'd come up with that proof on the nigger.  [¶] . . . [¶]

---

**8**    Officer Potter testified that "in the gang jargon, hit specifically means nothing more than commit a murder."  Deputy Lovvik testified that he flagged the telephone call for his supervisors because of the reference to a district attorney being "hit."

"[Frazier]: You know, that got to be a condition of parole is seeing a psyche. [¶] . . . [¶]

"[Defendant]: Are you crazy?

"[Frazier]: No I ain't crazy.

"[Defendant]: Oh . . . Well you should let it roll, it might get you . . .

"[Frazier]: No I ain't fittin to play nothin.

"[Defendant]: Yeah.

"[Frazier]: Yeah I gave little Troub.

"[Defendant]: Yeah.

"[Frazier]: Yeah I gave him some and I had found two pistols in the garage here.

"[Defendant]: Yeah. Don't be talkin over the phone cuz, they've got my girl's phone tapped.

"[Frazier]: But anyway I gave them to troub.

"[Defendant]: Is that right.

"[Frazier]: Yeah."

The prosecution argued that the tape recording of the telephone call was "highly relevant as to three areas concerning consciousness of guilt: disposing or hiding evidence, witness intimidation, murdering a district attorney as well." First, it contended that the recording showed that Frazier gave "two pistols" to "little Troub," whom the prosecution claimed was Sherman,[9] which was probative

---

[9] The only evidence linking Sherman to this nickname was Detective Thrash's testimony that Rainey had referred to Sherman as "Baby Troub." Officer Potter testified that, in gang parlance, variations on a moniker generally referred to different people. Using his own last name as an example, Officer Potter explained that he would be referred to as "Big Potter." If he brought somebody into the gang, that person would be referred to as "Potter." If "Potter" brought somebody

*(footnote continued on next page)*

because no murder weapon was recovered and Frazier's statement was followed by an admonishment that the telephone was "tapped." Second, the prosecution argued that the purpose of Frazier's suggestion that defendant "get the transcripts" was to "intimidate and find out who those [witnesses] are." Third, the prosecution claimed that defendant's statement about needing a district attorney "hit" (i.e., murdered) showed consciousness of guilt. Defendant objected that the recording was difficult to understand, irrelevant, speculative, remote, and more prejudicial than probative. The trial court permitted the jury to hear the tape, which was introduced through Deputy Lovvik. The transcript of the recording, with the trial court's corrections, was given to the jurors as an aid for listening to the tape but was not itself introduced as evidence.

During the defense case, defense counsel called Frazier as a witness. Frazier testified that at the time of the telephone call, he had recently been paroled and was not allowed to possess firearms. He found "two old revolvers," which were not working, in his garage and gave them to his neighbor, whose street name was "Troub." He had never met Sherman and did not know Sherman as "Troub," "Little Troub," or "Baby Troub." The conversation about the pistols was not related to defendant's case. Frazier asked about the preliminary hearing transcripts because he wanted to find out why defendant was bound over after his preliminary hearing. He thought the witnesses' names and addresses would be

---

*(footnote continued from previous page)*

into the gang, that person would be referred to as "Little Potter." If "Little Potter" brought somebody into the gang, that person would be referred to as "Baby Potter." Sherman's counsel argued that the evidence Sherman used the moniker "Baby Troub" was weak and, in any event, "Baby Troub" would be a different person than the "Troub" or "little Troub" mentioned in the taped conversation.

redacted and did not intend to intimidate or harm anybody. Frazier thought the reference to "need[ing] that DA hit" was just defendant "say[ing] things in the heat of the moment," because he was angry about how his preliminary hearing had gone; it was not a suggestion for Frazier "to go out and hit a D.A."

Defense counsel also called Darlene Garrett Frazier, Frazier's wife, as a witness. She testified that her ex-boyfriend had left two old revolvers at her house, which she moved to the garage. Sometime later, she realized the pistols were missing, and Frazier told her that he had given them to somebody. She did not have a neighbor named "Troub" or know anybody named "Troub," nor did she know Sherman.

At the close of evidence, the prosecution asked the trial court to give CALJIC No. 2.06, which instructs the jury that attempts to suppress evidence can be considered as a circumstance tending to show consciousness of guilt, on the theory that the taped conversation showed that defendant tried to suppress a weapon used in the shootings. The trial court denied the instruction. It found that the conversation might support an inference that Frazier suppressed evidence "in an attempt to assist the defendant," but it was insufficient "to indicate that the defendant was doing something in taking positive step[s] to suppress or conceal evidence on his own behalf." The trial court did permit the prosecution to argue during closing arguments that the jury could infer consciousness of guilt from the conversation, and the prosecution did so.

*b. Discussion*

Defendant argues that the tape recording was inadmissible because it was irrelevant and more prejudicial than probative. (Evid. Code, §§ 350, 352.) First, he contends that the evidence was irrelevant because the recording would tend to prove consciousness of guilt only if the jury *speculated* that Frazier was helping

31

defendant dispose of or conceal the murder weapon and that defendant wanted to intimidate witnesses or kill the prosecutor. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1035 ["Defendant correctly observes that evidence leading only to speculative inferences is irrelevant."].) Defendant then argues that even if the recording was admissible, the trial court should nonetheless have excluded it under Evidence Code section 352 because it had minimal probative value, "diverted the jury's attention from the weakness of the prosecution's case," "encouraged the jury to draw conclusions regarding [defendant's] guilt *and* his bad character," "unfairly misled and inflamed the jury," and "confused the issues" since defendant was not on trial for threatening witnesses or prosecutors or for being a gang member.

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

The trial court did not abuse its discretion in concluding the recorded conversation was relevant. The jury could have inferred consciousness of guilt from the taped conversation, particularly when also considering other evidence adduced at trial. The conversation indicates that Frazier gave two pistols to someone named "Troub" or "Little Troub," and the recording and other testimony gave rise to an inference that that person was Sherman. Moreover, Frazier's

32

statement was followed by a swift admonishment not to talk about guns, because the telephone was "tapped." There was discussion about who various witnesses at the preliminary hearing were, and Officer Potter had testified that gang members often intimidate witnesses to keep them from testifying at trial. And in the recording, defendant referred to needing "that DA hit." The meaning of the conversation was not speculative merely because inferences were required to find that it showed consciousness of guilt. Nor did Frazier's testimony about his understanding of the conversation destroy the relevance of the conversation, because the prosecution was free to, and did, argue other reasonable inferences. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1166 [" 'Circumstantial evidence involves a two-step process — first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence' "].)**10**

Nor did the trial court abuse its discretion in declining to exclude the evidence under Evidence Code section 352. If the jury subscribed to the prosecution's understanding of the taped conversation, then it was damaging to defendant. But "[t]he prejudice which exclusion of evidence under Evidence Code

---

**10** Our conclusion about the relevance of the taped conversation does not change because the trial court denied the prosecution's request to give the jury CALJIC No. 2.06. The trial court admitted the recording based on the prosecution's offer of proof, and the prosecution cited three reasons, detailed above, why the conversation was relevant to prove consciousness of guilt. The trial court's decision not to give CALJIC No. 2.06 was based only on its belief that there was not "sufficient evidence to connect the defendant's action to the attempt to conceal evidence"; the court did not address the prosecution's other two reasons why the conversation demonstrated consciousness of guilt. And although the trial court declined to give CALJIC No. 2.06, it nonetheless permitted the prosecution to argue during closing arguments that the jury could infer consciousness of guilt from the conversation.

33

section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Although the parties debated the meaning of the taped conversation — which contained both statements that could be interpreted as inculpatory and statements that could be interpreted as exculpatory — the recording was neither misleading nor inflammatory, and was therefore properly admitted.

Defendant further argues that the tape recording was unintelligible and should have been excluded under Evidence Code section 352 on that basis. This is incorrect; much of the tape is intelligible. " '[A] tape recording may be admissible even if substantial portions of it are unintelligible.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1205.) " ' " '[T]o be admissible, tape recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness.' [Citations.]" [Citation.] [¶] Thus, a partially unintelligible tape is admissible unless the audible portions of the tape are so incomplete the tape's relevance is destroyed.' " (*Ibid.*) Although we agree that portions of the tape recording are difficult to understand, most of the recording is intelligible, and the portions the prosecutor used were clear enough and did not create an inference of speculation or unfairness. Indeed, Frazier's testimony regarding the telephone conversation was consistent with the prosecution's understanding of the words on the tape; Frazier disagreed only with respect to the appropriate inferences to draw

from those words.  (Cf. *id.* at pp. 1205–1206; *People v. Siripongs* (1988) 45 Cal.3d 548, 574; *People v. Ketchel* (1963) 59 Cal.2d 503, 519.)

Defendant claims that the trial court compounded its error in allowing the tape to be played by also permitting the jurors to use a transcript of the conversation as an aid while listening to the tape during trial.  We find no abuse of discretion.  Only the recording was admitted as evidence; the transcript was not admitted as an exhibit, and the trial court took the transcript back from the jury after the tape was played.  The trial court admonished the jury that the transcript was simply an aid to help it understand the taped conversation, and that the jury was to be guided by its own interpretation of the recording.  In similar circumstances, reviewing courts have recommended that trial courts review the recording to ensure that the transcript reasonably reflects the recorded words.  (See *People v. Polk* (1996) 47 Cal.App.4th 944, 954–956, discussing *U.S. v. Robinson* (6th Cir. 1982) 707 F.2d 872, 876–878; *People v. Brown* (1990) 225 Cal.App.3d 585, 598–599; *People v. Miley* (1984) 158 Cal.App.3d 25, 36–37.)  The trial court did so here, and it made independent corrections to the transcript, which were a reasonable interpretation of the words spoken.  Unintelligible portions of the taped conversation were so marked in the transcript, and the transcript was not misleading.  (See *Polk*, at p. 955; *Brown*, at p. 599; *Miley*, at p. 36; *People v. Fujita* (1974) 43 Cal.App.3d 454, 472–473.)  Moreover, defense counsel did not, as far as we can tell, request any specific changes to the transcript.

Finally, defendant claims that admission of the tape recording and use of the transcript deprived him of his rights to due process, to a fair trial, and to a reliable judgment of death.  We disagree.  The admission of the tape recording, which we have found was not an abuse of discretion, did not render defendant's trial fundamentally unfair or otherwise violate his constitutional rights.  (*People v. Jones*, *supra*, 57 Cal.4th at p. 957; *People v. Riccardi*, *supra*, 54 Cal.4th at p. 809;

35

*People v. Partida* (2005) 37 Cal.4th 428, 436; *People v. Boyette*, *supra*, 29 Cal.4th at p. 413.)

## B. Penalty Phase Issues

### 1. *Exclusion of Prospective Juror No. 3389*

During the "death qualification" phase of jury selection, the trial court granted the prosecution's for-cause challenge to Prospective Juror No. 3389 (Juror 3389), on the ground that Juror 3389 had a "definite bias" for life imprisonment without the possibility of parole over the death penalty and would not "fairly consider both [sentencing] options in this case if given the opportunity to do so." Defendant argues that the trial court erred in excusing Juror 3389, requiring automatic reversal of the penalty verdict. (See *People v. Zaragoza* (2016) 1 Cal.5th 21, 41, citing *Gray v. Mississippi* (1987) 481 U.S. 648, 659–667.) Because the record supports the trial court's determination that Juror 3389 held views that would have substantially impaired the performance of his duties as a juror, we reject defendant's argument.

### a. *Background*

The written juror questionnaire described in general terms the guilt and penalty phases of the trial, explaining that if the jury found defendant guilty of first degree murder and found the special circumstance allegation true, then there would be a separate penalty phase. If the trial proceeded to the penalty phase, additional evidence would be presented, and the jury would be tasked with choosing between two sentencing options, death and life in prison without the possibility of parole. The questionnaire included a number of questions regarding attitudes toward the death penalty, to inform the court "whether or not [a juror] could be fair to both the prosecution and the defense on the issue of punishment."

36

According to his written answers in the juror questionnaire, Juror 3389 was a 66-year-old retired project manager. On the questionnaire, Juror 3389 checked boxes indicating that he was "moderately against" the death penalty; that he would not automatically vote for either life without the possibility of parole or the death penalty regardless of the evidence presented; and that he would not seek to avoid the issue of the death penalty by automatically refusing to vote for first degree murder or a special circumstance allegation regardless of the evidence presented. He described his general views about the death penalty as follows: "The death penalty should be used rarely, only when society cannot depend upon life in prison without the possibility of parole being 'absolutely' implemented." Juror 3389 explained that he was Roman Catholic, and that he accepted the church's view of capital punishment, which he articulated as follows: "The death penalty should only be imposed when life in prison without possibility of parole cannot be 'absolutely' implemented to protect society." He indicated that he believed death to be a worse punishment for a defendant than life without parole, explaining: "My religious beliefs include the fact that God demands justice, but God is also all forgiving to those who warrant forgiveness. Life in prison provides the opportunity to earn forgiveness. Society must be <u>absolutely</u> protected from a possibility of parole." (Underscoring in original.) He "disagree[d] somewhat" with the statement that "[p]rison sentences for convicted felons should be increased" and "strongly disagree[d]" with the statement that "[a]nyone who kills another person should get the death penalty," explaining, for both questions, that "[s]entences shou[l]d be appropriate for the crime." Juror 3389 also "strongly disagree[d]" with the statements that "[a]nyone who intentionally kills another person without legal justification, and not in self-defense, should receive the death penalty" and "[a]nyone who[] commits multiple murder should receive the death

37

penalty." With respect to both statements, he elaborated: "Why not life in prison without parole (literally); brain tumor; insane, etc."

During oral questioning, the prosecutor asked Juror 3389, "[Y]ou indicated in the questionnaire that you are opposed to the death penalty, correct?" He answered: "I didn't intend to state it clearly. Basically I believe that if there were such a thing as life imprisonment that would be sustainable, then I probably would not be. [¶] . . . [¶] . . . It's not a simple yes or no for me." The trial court instructed him to assume that a defendant sentenced to life without the possibility of parole "will live out the rest of their natural life in custody." Given that assumption, Juror 3389 stated: "I think it's possible that certain circumstances could allow me to [vote for the death penalty] if there were — I'll just invent one. If there were individuals that were incarcerated and had ended up killing three of the guards, you know, where the system was having difficulty with that individual and where that individual's existence is hazardous to some segment of society, even though it happens to be inside within the prison, then I could find — I would find that an easy decision to say, hey, I would go the other way." He could not think of any other "obvious" examples and stated, "My inclination is to try to avoid the death penalty, inclination but not an absolute." In response to additional questions from the prosecutor, Juror 3389 suggested that he might be able to return a death verdict in "some situation where a person is in prison and still at risk," but "[a]bsent something like that, [his] inclination [was] to always vote for life without the possibility of parole." Defense counsel inquired, "If you sat in the penalty phase and you felt the facts and evidence presented warranted a death verdict, could you render such a verdict?" Juror 3389 responded: "In other words, if it fit my criteria, yes."

The prosecutor challenged Juror 3389 for cause, because Juror 3389 did not have an "open mind" to the death penalty and would consider the death penalty

only in very limited circumstances that did not apply in this case.  Defense counsel opposed the challenge, because Juror 3389 "was open, depending on the circumstances and facts of the case, to render a verdict of death if he felt it was warranted."  The trial court granted the challenge.  "It appears from [Juror 3389's] answers that he has a definite bias in favor of the life without parole and that the only situation in which he could foresee himself, the only one he gave as an example — even when I asked him for additional situations where it might occur — the only one that came to mind for him is a situation where someone was already serving a life sentence and had committed further murders while in custody serving that life sentence.  [¶]  I believe that based upon his expression of his strong religious beliefs that he would not fairly consider both options in this case if given the opportunity to do so."

### b.  Discussion

A prospective juror may be excused for cause " 'only if his or her views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath.' [Citation.]" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1064; see *Uttecht v. Brown* (2007) 551 U.S. 1, 6–9; *Wainwright v. Witt* (1985) 469 U.S. 412, 424–425.)  "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176.)  "The critical issue is whether a life-leaning prospective juror — that is, one generally (but not invariably) favoring life in prison instead of the death penalty as an appropriate punishment — can set aside his or her personal views about capital

punishment and follow the law as the trial judge instructs." (*Thompson*, at p. 1065.) We have recognized that prospective jurors may give "halting, equivocal, or even conflicting" responses regarding their views about the death penalty and their ability to set aside those views and follow the law. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1094.) Indeed, given a prospective juror's "probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected." (*Ibid.*)

"In light of the inherent ambiguities associated with the death qualification of juries, two rules have emerged. First, a prospective juror's bias against the death penalty, or the juror's inability to set aside his or her personal views and follow the law, need not be demonstrated with unmistakable clarity. [Citations.] Instead, after examining the available evidence, which typically includes the juror's written responses in a jury questionnaire and answers during voir dire, the trial court need only be left with a definite impression that the prospective juror is unable or unwilling to faithfully and impartially follow the law. [Citations.] [¶] Second, in assessing a prospective juror's true state of mind, the trial court occupies a superior position vis-à-vis an appellate court, for the former court is able to consider and evaluate a juror's demeanor during voir dire. [Citations.] ' " '[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor) . . . gleans valuable information that simply does not appear on the record.' " [Citations.]' [Citation.] Accordingly, the trial court's ruling regarding the juror's true state of mind is entitled to deference on appeal if supported by substantial evidence. [Citations.]" (*People v. Thompson*, *supra*, 1 Cal.5th at p. 1066.)

Substantial evidence supports the trial court's decision to dismiss Juror 3389 for cause. Juror 3389 made clear in his written questionnaire answers and responses to questioning that he would not vote for death as long as life without the possibility of parole meant that defendant would never be released. After the trial court instructed him to assume as much, further questioning revealed that Juror 3389 would be willing to vote for the death penalty only if the case "fit [his] criteria," and his criteria were narrow: He articulated only a single hypothetical situation in which he could see himself voting for the death penalty — where a defendant continued to kill while in prison — and that hypothetical situation was not applicable in this case. (See *People v. Martinez* (2009) 47 Cal.4th 399, 432 ["Excusal for cause is not limited to a juror who ' "zealously opposes or supports the death penalty in every case." ' "]; *ibid.* ["the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case[s] does not necessarily render the dismissal of the juror an abuse of discretion"].)

Defendant argues that the trial court's statement that Juror 3389 had "a definite bias in favor of the life without parole" shows that the trial court found that Juror 3389 merely had a preference in favor of one penalty option, which is not the correct legal standard. But the trial court went on to conclude that Juror 3389's responses, and particularly his expression of strong religious beliefs, showed that "he would not fairly consider both [sentencing] options." "The gravamen of the court's finding was clearly that [Juror 3389] was impaired under the [*Wainwright v.*] *Witt* standard." (*People v. Thomas* (2011) 52 Cal.4th 336, 360–361; see, e.g., *People v. Merriman*, *supra*, 60 Cal.4th at p. 53 ["The focus of questioning by the court and the parties was whether there was a likelihood that S.B. fairly could consider both the death penalty and life without parole. We have repeatedly explained that such an inquiry is a proper formulation of the standard

41

set forth in *Wainwright v. Witt*, *supra*, 469 U.S. 412"].)  "*Witt* has long been the law and it is clear the court was aware of the appropriate standard to apply.  In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' "  (*Thomas*, at p. 361.)

Defendant also contends that the trial court had insufficient information to make a reliable determination that Juror 3389's views on the death penalty would have prevented or substantially impaired the performance of his duties.  He notes, in particular, that the trial court did not specifically inquire of Juror 3389 whether, "despite his personal feelings about the death penalty, [he] was willing and able to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death was the appropriate penalty under the law."  We agree that the better practice is to ask such a question.  But the focus of our review is whether there is substantial evidence to support a conclusion that the juror would not be able to set aside his or her personal feelings and follow the trial court's instructions concerning the imposition of the death penalty.  (See *People v. Thompson*, *supra*, 1 Cal.5th at p. 1075 ["Prospective Juror Kusum P. had generally strong feelings against the death penalty.  Although she was never asked expressly whether she could set them aside and follow the law, her answers provided substantial evidence that she could not fairly consider both sides."]; see also *Wainwright v. Witt*, *supra*, 469 U.S. at p. 424 ["determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism"]; *People v. Whalen* (2013) 56 Cal.4th 1, 39–40.)  And, for reasons already discussed, Juror 3389's responses to the written questionnaire and oral questioning provided substantial evidence for the trial court's conclusion that the juror would not be able to set aside his personal feelings about the death penalty and follow the trial court's instructions.  Defendant's reliance on *People v. Stewart* (2004) 33 Cal.4th 425, 442–451 is

misplaced. "There we confirmed that, when the court chooses to rely solely on a prospective juror's written questionnaire answers to justify excusal, the answers themselves must clearly indicate the juror's unwillingness or inability to determine the appropriate penalty under the instructions. We indicated that a brief written response to a question whether the juror's death penalty views would ' "prevent or make it very difficult" ' to do so would not suffice. [Citation.] Here, however, the court and both counsel subjected [Juror 3389] to substantial oral examination, and the court was able to observe [Juror 3389] during this process. Under such circumstances, a juror's conflicting or ambiguous answers may indeed give rise to the court's definite impression about the juror's qualifications, and its decision to excuse the juror deserves deference on appeal." (*People v. Jones* (2012) 54 Cal.4th 1, 44.)

2. *Constitutionality of the Multiple-murder Special Circumstance*

The jury found defendant guilty of the murders of Lopez and Villa and, accordingly, found true the multiple-murder special-circumstance allegation, making defendant eligible for the death penalty. (§ 190.2, subd. (a)(3).) Defendant argues that the judgment of death must be reversed because the multiple-murder special circumstance "does not achieve the constitutional goal of distinguishing in any meaningful or principled way the few cases in which the death penalty may be imposed from the many cases in which it may not." As defendant acknowledges, we have rejected this argument numerous times (see, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 934, citing cases), and we decline defendant's invitation to revisit the issue.

3. *Admission of Evidence of Unadjudicated Criminal Activity*

During the penalty phase, the prosecution introduced as aggravating evidence under section 190.3, factor (b), six incidents of alleged, unadjudicated

43

criminal activity by defendant. (See *ante*, pt. I.B.2.a.) Defendant argues that the judgment of death must be reversed because factor (b) and the use of unadjudicated criminal activity during the penalty phase violate various constitutional rights. We have previously rejected each of defendant's arguments, and we do so again here.

Section 190.3, factor (b) does not, as defendant contends, allow the "arbitrary and capricious application of the death penalty in violation of the Eighth Amendment requirement that a rational distinction be made 'between those individuals for whom death is an appropriate sanction and those for whom it is not.' " (See *People v. Dement* (2011) 53 Cal.4th 1, 56.)

Defendant argues that we have interpreted factor (b) in an overly broad manner and have "treated death differently by lowering rather than heightening the reliability requirements in a manner that cannot be countenanced under the federal Constitution." "In prior decisions, we have rejected the identical argument." (*People v. Taylor* (2010) 48 Cal.4th 574, 651; see *People v. Harris* (2008) 43 Cal.4th 1269, 1315.)

Allowing the guilt phase jury to adjudicate other-crimes evidence during the penalty phase did not deprive defendant of an impartial and unbiased jury. (*People v. Thomas* (2012) 53 Cal.4th 771, 836; *People v. Rogers* (2006) 39 Cal.4th 826, 894.) Nor did using the same jury during the guilt and penalty phases force defendant "to make impossible and unconstitutional choices during jury selection." (See *People v. Taylor*, *supra*, 48 Cal.4th at p. 652.)

"We have also found that the use of unadjudicated offenses in capital proceedings, but not in noncapital matters, does not violate equal protection or due process principles." (*People v. Taylor*, *supra*, 48 Cal.4th at p. 651; see *People v. Watson* (2008) 43 Cal.4th 652, 701.)

*4. Other Challenges to California's Capital Sentencing Scheme*

Defendant raises numerous other challenges to the California capital sentencing scheme, which he acknowledges we have previously considered and rejected. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303–304.) We briefly respond to, and reject once again, each of these arguments.

Section 190.3, factor (a), which directs the jury to consider the "circumstances of the crime," does not result in the arbitrary and capricious imposition of the death penalty in violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. (*People v. Simon* (2016) 1 Cal.5th 98, 149; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976.)

Nothing in the federal Constitution requires the jury, at the penalty phase, to make written findings; to unanimously agree that particular aggravating circumstances exist; or to find beyond a reasonable doubt that aggravating factors exist, that aggravating factors outweigh mitigating factors, or that death is the appropriate sentence. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1376; *People v. Jackson* (2016) 1 Cal.5th 269, 373.) These conclusions are not altered by the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296, *Cunningham v. California* (2007) 549 U.S. 270, and *Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616]. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235 & fn. 16; *Seumanu*, at p. 1376.)

The federal Constitution does not require that a burden of proof be placed on the prosecution at the penalty phase. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 372.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79.) The trial court did not err in failing to instruct the jury that the prosecution had the

burden of persuasion regarding the existence of aggravating factors or the appropriateness of the death penalty. (*Jackson*, at pp. 372–373.) "Nor is an instruction on the *absence* of a burden of proof constitutionally required." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1067.)

"Section 190.3, factor (b) does not violate the federal Constitution by permitting the use of unadjudicated criminal activity as an aggravating factor, nor must such factors be found true beyond a reasonable doubt by a unanimous jury." (*People v. Harris*, *supra*, 43 Cal.4th at p. 1323.) This conclusion is not altered by the high court's decisions in *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, *Ring v. Arizona*, *supra*, 536 U.S. 584, *Blakely v. Washington*, *supra*, 542 U.S. 296, and *Cunningham v. California*, *supra*, 549 U.S. 270. (*People v. Taylor*, *supra*, 48 Cal.4th at pp. 651–652.)

"CALJIC No. 8.88 properly instructs the jury on its sentencing discretion and the nature of its deliberative process." (*People v. Valencia* (2008) 43 Cal.4th 268, 310.) Its instruction that "jurors may impose a death sentence only if the aggravating factors are ' "so substantial" ' is not impermissibly vague or ambiguous." (*People v. Jackson*, *supra*, 1 Cal.5th at p. 373.) "CALJIC No. 8.88 is not constitutionally flawed because it 'uses the term "warrants" instead of "appropriate." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1211.) Nor is it "unconstitutional for failing to inform the jury that if the mitigating circumstances outweigh those in aggravation, it is required to return a sentence of life without the possibility of parole." (*Ibid.*)

"CALJIC No. 8.85 is both correct and adequate." (*People v. Valencia*, *supra*, 43 Cal.4th at p. 309.) Its inclusion of such adjectives as "extreme" and "substantial" in the list of potential mitigating factors did not prevent the jury from considering mitigating evidence. (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1069.) The trial court properly instructed "the jury in the language of CALJIC

No. 8.85 without deleting certain factors that were inapplicable to defendant's case." (*People v. Farnam* (2002) 28 Cal.4th at pp. 191–192.) The trial court had no obligation to advise the jury which sentencing factors were aggravating, which were mitigating, or which could be either aggravating or mitigating depending on the jury's appraisal of the evidence. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1178–1179.)

"The trial court was not required to instruct the jury that defendant bears no burden to prove mitigating factors or that it need not be unanimous in finding the existence of any mitigating factor." (*People v. Adams* (2014) 60 Cal.4th 541, 580.) "Defendant was not entitled to an instruction that there is a presumption in favor of life without parole." (*People v. Boyce* (2014) 59 Cal.4th 672, 724.)

The federal Constitution does not require intercase proportionality review. (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.) "California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants." (*Id.* at p. 150.) International law and norms do not render California's use of the death penalty unconstitutional. (*Ibid.*)

## C. Cumulative Error

Defendant asserts that the cumulative effect of errors committed requires reversal of the judgment of conviction and/or the death judgment. We have assumed that the trial court improperly restricted defense counsel's cross-examination of Munguia, Granillo, and Detective Collette, but have found any error in that regard harmless beyond a reasonable doubt. (See *ante*, pt. II.A.1.b.) We have found no other errors, and defendant's claim of cumulative error fails.

### III. Disposition

We affirm the judgment.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Jones

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S075725
**Date Filed:** July 20, 2017

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Bradford L. Andrews

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jessica K. McGuire, Assistant State Public Defender, and Ellen J. Eggers, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jessica K. McGuire
Assistant State Public Defender
770 L Street, Suite 1000
Sacramento, CA  95814-3362
(916) 322-2676

Viet H. Nguyen
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-0207