Filed 5/23/22  In re A.H. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | C094824 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.H.,<br><br>Defendant and Appellant. | (Super. Ct. No. STKJVDP20190000345) |

Mother appeals the juvenile court's order terminating her parental rights and freeing the minor A.H. for adoption.  (Welf. & Inst. Code, § 366.26.)[1]  She contends the juvenile court erred in:  (1) failing to conduct the assessment required by *In re Caden C.*

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

(2021) 11 Cal.5th 614 (*Caden C.*), and (2) failing to make any findings on the applicability of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). We disagree for the reasons explained herein and will affirm the juvenile court's orders.

## I.  BACKGROUND

Mother tested positive for alcohol and amphetamines at the premature birth of A.H. in August 2019 and admitted to drinking alcohol and using diet pills during her pregnancy, resulting in a referral to the San Joaquin County Human Services Agency (Agency). A.H. suffered from multiple birth defects and was suspected to have fetal alcohol syndrome and fetal alcohol effect.[2] He was placed in a neonatal intensive care unit, where mother visited him, but she was generally uncooperative with the Agency. Nonetheless, mother denied Native American ancestry and completed an ICWA-020 form to that effect. L.H., who was separated from mother, denied that he was A.H.'s father, told the Agency he had no Native American ancestry, and completed two ICWA-020 forms to that effect.[3] L.H. also signed a safety plan agreeing to seek a temporary emergency order for full custody of A.H.'s five-year-old sibling. The Agency obtained a protective custody order for A.H., and he stayed in the hospital for 42 days before going directly into foster care.

On October 24, 2019, mother submitted on jurisdiction, and the juvenile court found there was a factual basis for the submission and that the Agency's allegations, including that A.H. fell under section 300, subdivision (b) due to mother's substance abuse, were true.

The Agency's December 2019 disposition report reflected that A.H. had been diagnosed with muscular dystrophy, arthrogryposis, and required further assessment for

---

[2] Testing confirmed A.H. suffered from muscular dystrophy and tested positive for amphetamines at birth. He also suffered from wrist abnormalities.

[3] These forms were filed with the court on September 6, 2019, and November 14, 2019.

fetal alcohol syndrome.  Although only three months old, he was seeing a neurologist and an orthopedic specialist.  He was also scheduled to start physical therapy and had been prescribed arm braces.  Mother was in denial regarding the seriousness of A.H.'s health problems, but visited with him two times weekly at her residential treatment program. Mother submitted on the disposition report, but requested more visitation and to breastfeed A.H. if approved by the doctor.  The juvenile court found A.H. a dependent, incorporated the Agency's findings and orders, granted the Agency discretion to increase visitation, and allowed breastfeeding providing mother stayed in her program and tested negative.

The six-month status report (§ 366.21, subd. (e)) reflected in pertinent part that mother had participated in services with varying degrees of success and that she had resumed visitation with A.H. in virtual form in April 2021, calling three times a week for virtual visits lasting between 30 minutes to one hour.  Prior to the shutdown of in-person visitation, mother participated in 13 of 26 scheduled visits.[4]  A.H. was developmentally delayed, had seen a cardiac specialist and a pediatric surgeon, and was also seeing an occupational therapist and a physical therapist.  His diagnosed conditions included: fetal alcohol syndrome, contractures of both wrists and hands, an atrial septal defect, stenosis of the pulmonary artery, and muscular dystrophy.  The Agency recommended the continuation of reunification services, but also relayed that A.H. had been concurrently determined to be adoptable, despite his potentially lifelong, chronic conditions.  At the July 14, 2020 hearing, the court continued reunification services, authorized discretion for community visitation, and adopted the other recommendations of the Agency.

The Agency's September 2020 status review report (§ 366.21, subd. (f)) reflected that the home mother shared with her mother (A.P.) had passed inspection in August and

---

[4] Mother was blameless for five of these cancellations, but no called/no showed for six visits and was sick for another two.

that unsupervised community visits for three hours twice weekly had begun. A.H. was adjusting well to his new placement and routine. Mother attended A.H.'s successful surgery placing tubes in his ears.

At the September 22, 2020 hearing, mother submitted on the September 2020 status review report, and the juvenile court adopted the proposed findings and orders, including that mother would continue to receive reunification services and that the Agency had discretion to begin overnight visits. Notably, these findings also included that A.H. was not an Indian child within the meaning of the ICWA.

The Agency's March 2021 status review report (§ 366.22) recommended the termination of reunification services. While mother initially made progress towards reunification, she relapsed in November 2020, resulting in her termination from the drug court program. Nonetheless, mother attended at least some of A.H.'s medical appointments[5] and was visiting with A.H. two times weekly for four hours each visit at A.P.'s home. A.H.'s caregiver reported that he did well after visits. Further, mother had moved out of A.P.'s home, which was pending approval for placement of A.H. A.P. had "attended most if not all of [A.H.]'s medical appointments" during the seven months or so that A.H. had been in his current placement.

At the March 16, 2021 hearing, the juvenile court awarded discretion to the Agency (in consultation with A.H.'s doctor and attorney) to place A.H. with A.P., who assured the court that she had attended all of the minor's medical appointments and was prepared to retire so that she could care for him full time. The termination of reunification services was set for a contested hearing on April 19, 2021.

_____

[5] A.H.'s medical struggles continued as he was suffering from developmental delays, feeding problems, and multiple congenital abnormalities for which he was seeing a physical therapist, an occupational therapist, a neurologist, and a cardiologist, in addition to his pediatrician.

4

Mother failed to appear at the contested hearing, and the juvenile court denied her counsel's request for a continuance. The court then adopted the proposed findings and orders of the Agency. The court also reduced mother's visits to once weekly, and the matter was set for a termination of parental rights and selection and implementation of permanency plan hearing on August 4, 2021, which mother ultimately contested. In the interim, A.H. was placed with A.P. in May 2021.

The August 2021 selection and implementation report (§ 366.26) recommended the termination of parental rights and release of A.H. for adoption. A.H.'s maternal grandparents (A.P. and her husband) were committed to adopting him and keeping him within the family, but were against a "post adoption agreement." A.P. described A.H. as " 'my little world' " and expressed her love for him and desire to protect him. Prior to his placement in A.P.'s home, A.P. had accompanied mother to supervised visits early on in the dependency case and later supervised visits with mother in A.P.'s own home.

The report further reflected that following the termination of reunification services, mother was arrested on July 2, 2021, for felony possession of a controlled substance while armed with a loaded handgun that was not registered to her and possession of a controlled substance for sale. This corresponded with the last day A.P. reported that mother visited A.H. Nonetheless, the report noted that mother was appropriate with A.H. at visits, that A.H. enjoyed those visits, and that mother visited consistently. Ultimately, the report concluded that visits with mother "are appropriate and beneficial for [A.H.] however, [A.H.] is needing a full-time parent who is able to attend to his needs and protect him. The mother's continued challenges places him at risk for harm and danger."

At the contested section 366.26 hearing, the Agency presented the selection and implementation report as evidence. Mother then testified to visiting A.H. for four hours each Friday at her mother's home. Mother reported that A.H was happy to see her and that they engaged in various activities together such as her preparing his food and feeding

5

him, as well as her helping him to do exercises to get stronger given his difficulties. Mother described their relationship as "beautiful" and relayed that she enjoyed making him laugh. Mother felt they were bonded because she loved him, relaying: "I try to spend as much time [with him] as I can. Given the opportunity, I would love to be the one to give him his baby baths and take him to his appointments, nurture him." Mother disagreed with the Agency's recommendation to terminate her parental rights, stating: "I love my child, and I know I made a mistake. And I am working every day to be a better person for myself and to be a better mom. And he's just two. I would love to be in his life." None of the parties to the hearing cross-examined mother or offered any rebuttal evidence.

Thereafter, the Agency requested the juvenile court follow the recommendation to terminate parental rights and free A.H. for adoption, arguing mother had not met her burden of establishing an exception thereto. Specifically, the Agency highlighted that, "There's been no information of any kind of bond between the mother and the minor that would be extremely detrimental to that bond if parental rights were terminated." A.H.'s counsel agreed, highlighting that he had been out of the mother's care since the start of the case such that the type of bond that would be needed had not formed, and given these circumstances, A.H.'s best interests would be served by termination and freeing him for adoption. Mother opposed termination, arguing she was bonded with A.H., had consistently and appropriately visited him, and that he enjoyed and benefitted from those visits.

The court then ruled, stating: "When we get to this stage, the burden shifts to the parent to show that one of the exceptions applies, and I really don't have enough evidence to find that application of an exception, nor has there been a showing that the severance would be detrimental to the child. So the Court is in the position where it has very little choice. [¶] I'm going to proceed with the recommendation. Court finds notice has been given as required by law. The Court has read and considered the [section

6

366].26 assessment report.  Court previously made a finding denying or terminating reunification services to the parents.  Court finds by clear and convincing evidence that it's likely the child will be adopted.  It is in the minor's best interest to have parental rights terminated.  Termination of parental rights is not detrimental to the minor.  [¶] None of the exceptions pursuant to . . . [s]ection 366.26[, subdivision ](c)(1) exist, therefore, the parental rights of the mother, [M.H.,] . . . are hereby terminated."

Following this ruling, mother's counsel requested continued visitation and/or a goodbye visit, prompting the social worker to say, "The grandmother [A.P.] reports that the visits are appropriate and beneficial to [A.H.], and she's in agreement with ongoing weekly visits with him at the current arrangements."  The court authorized continued visits, but then noted once adoption is finalized it would be up to the "new parent." Mother timely appealed.

## II.  DISCUSSION

### A.    *The Parental Benefit Exception*

Mother challenges the juvenile court's ruling that she had not presented sufficient evidence to establish that the parental benefit exception to adoption applied to A.H.'s case.  She argues that because the court failed to conduct the assessment required by *Caden C., supra*, 11 Cal.5th 614, the case must be reversed and remanded for further proceedings.  As we shall explain, mother has failed to establish the juvenile court erred.

#### 1.    *Background*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1).)  One such exception is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing

the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252.)

To establish the beneficial parent-child relationship exception, the parent must show by a preponderance of the evidence three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631; see *id.* at p. 636.) In assessing whether termination would be detrimental, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) When the parent meets this burden, the exception applies such that it would not be in the child's best interest to terminate parental rights, and the court selects a permanent plan other than adoption. (*Id.* at pp. 636-637.)

The first element of the exception asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C., supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

The second element asks "whether 'the child would benefit from continuing the relationship.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C., supra,* at p. 632.) "[T]he parent must show that the child has a substantial, positive, emotional attachment to the parent—

the kind of attachment implying that the child would benefit from continuing the relationship." (*Id.* at p. 636.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.) The court is guided by the child's best interest in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the child's beneficial relationship with a parent." (*Id.* at pp. 633-634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.)

We review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C., supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639-640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even when substantial evidence to the contrary also exists. (*Id.* at p. 640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Ibid.*) "A court abuses

9

its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

### 2. *Application*

In the present case, the juvenile court ruled from the bench that mother had not presented sufficient evidence to establish the "application of an exception, nor has there been a showing that the severance would be detrimental to the child." As such, it appears the court found mother's evidence of two, if not all three, of the required elements to establish the parental benefit exception were lacking. (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.) Mother contends the juvenile court erred by not outwardly engaging in the analysis required by *Caden C.* and that a review of the evidence offered in support of the parental benefit exception shows that she had met her burden to establish the exception. We disagree.

At the outset, we highlight that *Caden C.* was decided May 27, 2021, approximately three and a half months prior to the juvenile court's section 366.26 ruling in this case. (*Caden C., supra*, 11 Cal.5th 614.) Accordingly, we presume, in the absence of any evidence to the contrary, that the court was aware of and complied with the law, including *Caden C.* (See, e.g., *People v. Jones* (2017) 3 Cal.5th 583, 616 [" 'In the absence of evidence to the contrary, we presume that the court "knows and applies the correct statutory and case law" ' "].)[6]

Nor do we agree with mother's suggestion that the juvenile court was required to make individual findings related to the elements of the parental benefit exception. While

---

[6] Because there is no indication in the record that the juvenile court's analysis may have run afoul of *Caden C.*'s guidance, mother's reliance on *In re D.M.* (2021) 71 Cal.App.5th 261, *In re B.D.* (2021) 66 Cal.App.5th 1218, and *In re D.P.* (2022) 76 Cal.App.5th 153 is unavailing. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1160-1161, fn. 14 [no need to remand for further consideration following *Caden. C.* where there was no indication court considered factors deemed inappropriate thereby].)

this is required where the court finds the exception applicable (§ 366.26, subd. (c)(1)(D)), mother has not provided authority requiring that the juvenile court make these findings when denying the application of the parental benefit exception. (See *In re A.L., supra*, 73 Cal.App.5th at p. 1156 [rejecting assertion that prior to finding the exception *inapplicable*, "specific findings relative to [the court's] conclusions regarding any or all of the three elements of the [parental-benefit] exception" were required].)

Finally, concerning the court's insufficiency of evidence determination, we concur with the juvenile court that mother had not offered sufficient evidence to establish the applicability of the exception. On the first element, we note that there is evidence that mother visited A.H., however, it is questionable whether that visitation should properly be characterized as regular. Following disposition, mother had a period where she missed eight of the 26 scheduled visits, and at the end of the case, it appears that mother may have missed more of her then weekly visits because of her arrest on July 2, 2021. Nonetheless, we acknowledge that the section 366.26 report characterized mother's visitation as "consistent," and so there is some evidence from which the court could have concluded mother regularly visited.[7]

Assuming arguendo that mother provided sufficient evidence to meet the first element, it is not clear that mother established the *kind* of bond required for the second element. There is ample evidence of mother's bond with and commitment to A.H., as she loved him very much and attended as many of A.H.'s medical appointments and surgeries as possible. However, that is not the pertinent inquiry. Rather, the juvenile

---

[7] Mother's argument that she was "the most consistent parental figure in [A.H.]'s life" ignores that she has never had custody of A.H. and thus has never cared for him and met his daily needs. Moreover, any suggestion that A.P. was new to A.H. by virtue of the relatively short length of his placement in her home is belied by the record, which shows that A.P. supervised visitation with mother and attended *all* of A.H.'s medical appointments in the seven plus months preceding his placement with A.P.

11

court was tasked with evaluating whether A.H. was bonded to mother to the extent required for the exception to apply. (*Caden C., supra*, 11 Cal.5th at p. 632.)

Here, A.H., who was approximately two years old, had never been in mother's care and went straight from the hospital into foster care.[8] Nonetheless, we acknowledge that A.H. appeared to enjoy visiting with mother, would laugh with her, and that A.H.'s caregivers had indicated to the Agency that A.H. enjoyed his visits with mother, that the visits were beneficial to A.H., and that he did well following these visits.[9] However, because there was no bonding study conducted in this case, and given A.H.'s tender age, it is difficult to determine the strength and depth of *his* bond to mother. (See *Caden C., supra*, 11 Cal.5th at pp. 632-633, fn. 4 [noting the benefit of expert testimony to inform the bonding inquiry]; *id*. at p. 636 [requiring "the parent must show that the child has a *substantial*, positive, emotional attachment to the parent" (italics added)].)

We do not agree with mother that A.H.'s doing well following visits necessarily means he was happy because of and "gained emotional stability from their visits." It simply shows he was not harmed by them. Nor does mother's testimony on this element aid her. When asked by her attorney why they were bonded, mother failed to actually discuss A.H.'s bond to her, and rather, focused on her love for him and what she would like to do for him.

---

[8] This fact alone distinguishes this matter from *In re E.T.* (2018) 31 Cal.App.5th 68 wherein the mother had cared for her twins for nearly half of their lives, including a period of reunification with maintenance services. (*Id*. at pp. 73-75 [twins had lived with mother 22 months and the prospective adoptive parents 24 months].)

[9] Mother makes much of the social worker's statement following the termination of mother's parental rights that A.P. had reported A.H.'s visits with mother were appropriate and beneficial. However, this information is duplicative of the section 366.26 report, wherein the social worker generally acknowledged that mother's visits were "appropriate and beneficial." Accordingly, the juvenile court already had this information before it when it made its determination on the inapplicability of the parental benefit exception.

We acknowledge that the parent-child relationship in this context need not conform to a particular pattern (*Caden C., supra*, 11 Cal.5th at p. 632); however, it was incumbent upon mother to establish that her relationship with A.H. rose above that of a friendly visitor in the child's eyes. (See *In re B.D., supra*, 66 Cal.App.5th at p. 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate"].) Accordingly, while there was some evidence A.H. was bonded to mother, she has not established that the court erred in its implicit conclusion that the evidence was insufficient to establish the sort of bond required to meet the second element of the exception.

Moreover, even if we accepted that mother had established the second element, mother's appeal ultimately fails because the record is utterly devoid of any information showing that the bond between mother and A.H. was so strong that it would outweigh the " 'the security and the sense of belonging a new family would confer.' " (*Caden C., supra,* 11 Cal.5th at p. 633.) Mother presented no evidence concerning the loss that would be suffered by A.H. should mother's parental rights be terminated and their visits cease.[10] Accordingly, there is no evidence from which the court could have concluded that the loss of A.H.'s relationship with mother outweighed the benefits of adoption to this then two-year-old child by his adoring grandparents who were prepared to provide him stability and permanency, despite his many health needs. As such, mother has not demonstrated the trial court erred in determining she had presented insufficient evidence to establish the parental benefit exception to adoption.

---

[10] When asked whether she agreed with the Agency's recommendation to terminate her parental rights, mother explained that she "strongly disagree[d]," stating: "I love my child, and I know I made a mistake. And I am working every day to be a better person for myself and to be a better mom. And he's just two. I would love to be in his life."

*B.*     *Compliance with the ICWA*

Mother complains the juvenile court erred in failing to make any findings on the applicability of the ICWA. In response, the Agency contends the juvenile court's failure to make these findings was harmless. We disagree with both parties.

The juvenile court incorporated the Agency's proposed ICWA finding at the September 22, 2020 hearing. These findings stated: "The child is **not** an Indian child within the meaning of the Indian Child Welfare Act, and that notice of the proceedings has been given as required by law. Proof of such notice has been filed with the court." The juvenile court is presumed to have made this decision anew at the selection and implementation permanency planning hearing. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 6, 9, 14-15.) Accordingly, mother has not shown the juvenile court failed to comply with the ICWA.

## III.  DISPOSITION

The orders of the juvenile court are affirmed.

/S/

RENNER, J.

We concur:

/S/

BLEASE, Acting P. J.

/S/

HULL, J.

14