Filed 6/28/22  In re Daniel A. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re DANIEL A. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CAROLINA H.,<br><br>Defendant and Appellant. | F083678<br><br>(Super. Ct. Nos. 19CEJ300311-1, 19CEJ300311-2)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Kimberly J. Nystrom-Geist, Judge.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Carlie Flaugher, Deputy County Counsel, for Plaintiff and Respondent.

---

[*]     Before Hill, P. J., Peña, J. and DeSantos, J.

-ooOoo-

Carolina H. (mother) appeals the juvenile court's order terminating her parental rights to Daniel A. (born November 2013) and An.A. (born March 2015) (collectively, the children) pursuant to Welfare and Institutions Code section 366.26.[1] Mother contends (1) the juvenile court considered improper factors in determining that the parental-benefit exception to adoption did not apply, and that (2) the Fresno County Department of Social Services (department) failed to comply with the inquiry requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law. We conditionally affirm the orders terminating parental rights and remand for the juvenile court and the department to comply with the inquiry provisions of ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

**Petition and Detention: September 2019**

On September 2, 2019, the department received a referral on behalf of the children after their three-year-old brother, A.A., suffered serious physical trauma that resulted in his death while in the care of mother and Randy A. (father).[2] Two days later, the department filed a petition pursuant to section 300, subdivisions (a), (b)(1), (c), (f), (i), and (j) on behalf of the children, alleging the circumstances surrounding A.A.'s death placed them at substantial risk of suffering serious physical harm and neglect.[3] The children were placed in a licensed foster home.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] There was conflicting evidence as to whether father caused A.A.'s injuries and death, or if he died as a result of accidentally choking on food.

[3] During the pendency of these proceedings, mother and father had a fourth child. The child was detained after birth and the department filed a section 300 petition on his behalf. That child is not part of this appeal.

2.

The detention report showed that in June 2016 the children and A.A. were removed from mother's custody in a Los Angeles County dependency case due to father's substance abuse and mental health problems. Mother and father were ordered to participate in reunification services. Mother successfully reunified with the children, but father's services were terminated after he failed to comply with his case plan. Mother was granted sole legal and physical custody of the children and father was granted supervised visitation.

At the detention hearing on September 6, 2019, the juvenile court ordered mother to participate in weekly therapeutic supervised visits with the children. The court found visits with father would be detrimental and denied him visitation.

**Interim Review: October 2019**

The interim review report indicated the children were doing well in foster care placement. The previous month the children had attended A.A.'s funeral services. Mother was present but did not acknowledge them. The children appeared "disconnected" and "estranged" in her presence. Mother did not comfort the children when they began crying. The report further stated mother had not been compliant in scheduling therapeutic supervised visits with the children.

At the interim review hearing on October 3, 2019, the juvenile court terminated mother's therapeutic supervised visits and ordered she participate in supervised visits twice a week.

**Jurisdiction and Disposition**

*Jurisdiction and Disposition Report: November 2019*

In October 2019, mother began supervised visits with the children. She attended six visits and missed one visit. Mother was appropriate with the children during visits. She hugged them, played with them, and had age-appropriate conversations with them. She took snacks and was able to redirect them when necessary. However, mother lacked confidence when the children asked difficult questions. Daniel A. had a hard time at the

3.

end of visits, but mother comforted him and engaged staff members to help prepare him for separation. At a visit in November 2019, mother reported she was experiencing severe domestic violence with the children's father and asked the visitation coordinator for help. She reported all of her " 'no shows' " to court and visitation were always because father had "beat" her and he would not allow her to leave the house until the bruises were gone. The visitation coordinators helped mother get into a women's shelter and they did not hear from her again.

A family reunification panel determined it would not be in the children's best interests to provide either mother or father with reunification services because they had caused A.A.'s death through abuse or neglect. The department recommended a selection and implementation hearing be set to establish a permanent plan for the children.

*Jurisdiction and Disposition Hearing: February 2020*

On February 10, 2020, social worker Karla Aguilar testified that mother's visits with the children had been generally inconsistent except during the months of October 2019 and January 2020. In December 2019, Aguilar spoke to mother over the phone and asked why she had not visited the children. Mother reported she had transportation problems, but father was listening and Aguilar did not want to ask for details in his presence. The following day, Aguilar met with mother in person. Mother reported she was experiencing severe domestic violence with father and was fearful. Aguilar provided mother with a resource list of domestic violence services. Early in February 2020, Aguilar reached out to mother about setting up visits with the children. Mother reported she was living at a shelter and was no longer in a relationship with father. Aguilar had previously informed mother the children were being placed in Los Angeles County and mother agreed to visit them there. As for the quality of mother's visits, Aguilar testified the visits "seem[ed] to be going okay." The children expressed they wanted to continue visiting mother and were happy when they saw her. The children did not cry or appear sad when mother missed visits, but they did state they

4.

missed her. As far as accessing domestic violence services, Aguilar testified mother had a pattern of going to the women's shelter and then going back to father.

The juvenile court found all allegations in the petition true except for the serious emotional damage (§ 300, subd. (c)) allegation. Mother was bypassed for reunification services pursuant to section 361.5, subdivision (b)(4), and was granted supervised visitation with the children for a minimum of two times per month.[4] The court set a section 366.26 hearing for June 3, 2020, but it was continued several times and was not heard until September 2021.

## Section 366.26

### *Section 366.26 Report:  June 2020*

The children's care provider, C.S., reported that Daniel A. had a short temper and became upset easily. He was very fearful of the shower and was hypersensitive to sounds. An.A. continued to talk about the domestic violence she witnessed in her parents' home. Mother's visits had been limited to supervised video chat visits and telephone calls due to COVID-19 restrictions. C.S. was to facilitate two 1-hour video chat visits and two 15-minute phone calls per month. Mother missed one video chat visit because her phone would not hold a charge.

The department reported the children were generally adoptable due to their young age and good health. They had no medical or developmental problems and were participating in therapeutic services. C.S., who was the children's care provider during the previous Los Angeles County dependency case, wished to adopt the children.

The department conducted a likelihood of adoption analysis, first analyzing the strength and bond between the children and each care provider (i.e., C.S. and mother). The department considered four specific areas—structure, nurturing, challenge, and

---

[4]     Mother filed a section 388 petition asking the juvenile court to change the order bypassing her for reunification services. The petition was heard on the same date as the section 366.26 hearing and was denied.

5.

engagement. The department had observed three video chat visits between mother and the children and conducted three home visits by video chat and used those observations to conduct its analysis. Regarding structure, C.S. had a daily routine for the children, which they had grown accustomed to. The department noted C.S. had provided out-of-home care for the children during the Los Angeles County dependency proceedings from June 2016 to November 2018 and the children were again placed with her in September 2019.[5] As for mother, she demonstrated an appropriate ability to provide structure during the video chat visit as she kept the children engaged with an activity.

As for nurturing, C.S. demonstrated an appropriate ability to nurture the children with hugs, play, affection, and boundaries. Mother also demonstrated an appropriate ability to nurture the children. Mother took time to plan the visit and would give the children words of affirmation by complimenting them and telling them she loved and missed them. An.A. would ask when mother would be visiting them and would say she did not want calls to end because she loved her. An.A. sometimes referred to mother by her first name and other times called her " 'mommy.' " Daniel A. did not want to visit mother at times and would not always stay in view of the camera. When mother would tell him she loved him, he would sometimes say it back. However, mother did not know how to respond to the children sometimes. During an Easter activity, mother asked the children what she should draw on her paper egg. The children repeatedly told her to draw herself with A.A. Mother would not respond and after repeated requests, the children clarified, " 'You and who's dead.' " Mother then drew a little boy with angel wings and a halo. Daniel A. said he wanted to be an angel, and again mother did not respond.

---

[5] Although the report stated the children were placed with C.S. on September 2, 2019, the social worker testified the children were not placed in Los Angeles County until January 2020.

6.

Concerning challenge, C.S. challenged the children by giving them daily chores and praising them when done. She reinforced good behavior by occasionally buying them ice cream or toys. Mother demonstrated an appropriate ability to challenge the children by pretending she did not know how to draw something and asking the children to show her how to do it. Mother asked about Daniel A.'s homework, and she practiced colors and numbers with them.

Finally, in regard to engagement, C.S. demonstrated an appropriate ability to engage with the children. She helped Daniel A. with homework and helped prepare An.A. for kindergarten. She engaged them in art projects and outdoor activities. Mother engaged the children through activities, such as making paper crafts. She also talked to the children about how to express their feelings appropriately, encouraging them to take deep breaths when angry and apologizing to others.

The department next considered the children's need for stability, noting the children had formed a parent-child relationship with C.S. and referred to her as " 'mama [C.S.].' " The children looked to her for safety, reassurance, love, affection, attention, and nurture. C.S. was willing and able to provide for the children's needs. Although mother had previously successfully reunified with the children, she returned to a violent relationship with father that resulted in A.A.'s death. The department concluded the children's need for safety and stability outweighed their relationship with mother and father. The department recommended parental rights be terminated with adoption as the children's permanent plan.

### Section 366.26 Addendum Report: May 2021

In February 2021, a social worker met with each child individually. The social worker drew a " 'safe house' " with An.A. and explained to her that everyone inside the house were safe people. The social worker asked An.A. who she wanted to live in the house with her. An.A. named C.S., Daniel A., A.A., and her new infant brother. The social worker asked how she would feel if she lived with mother. An.A. would not

answer. When asked if she would rather live with C.S. or mother, An.A. quickly replied that she would rather stay with C.S. The social worker then asked how she would feel if her infant brother were to live with mother. She said, " 'bad,' " but could not say why. When the social worker asked Daniel A. who he would want living in his safe house, he said, " 'Angel.' " He explained Angel was "his brother who died." He said C.S. and An.A. could also live in his safe house. When asked how he would feel about living with mother, he said, " 'I don't know; it would be boring.' " He said he would rather live with C.S. but could not say why. He would feel "sad" if his infant brother went to live with mother. C.S. said Daniel A. expressed he did not want his infant brother to go with mother because he was afraid he would die.

As for mother's visitation, the report stated mother visited the children consistently. The visits were supervised by C.S. C.S. did not have any concerns regarding the visits and said mother did well engaging the children in games and learning activities. According to C.S., the children enjoyed the visits. Daniel A. sometimes questioned mother about why father "did what he did" to A.A., but mother would never answer.

The department concluded it would not be detrimental to the children to terminate parental rights. Although they shared a parent-child relationship with mother, it was more akin to that of a " 'friendly visitor' " and it did not outweigh the benefits of adoption.

### Section 366.26 Hearing:  September to November 2021

On September 16, 2021, mother testified she had been participating in domestic violence services and felt like she had become a better parent. As far as visits with the children, she said An.A. had a difficult time hanging up at the end of visits. An.A. would ask, " 'Mommy, when am I going to go with you?' " and, " 'Mommy, when are you going to come and move in with Mommy [C.S.]? Don't worry, she'll cook for you and she will make a room for you.' " She said Daniel A. used to talk a lot

8.

during visits, but recently there were times where he did not want to talk to her. She was surprised when she heard Daniel A. did not want to live with her, but she understood he wanted to be with "Mommy [C.S.]" where he felt safe. Like the children, mother referred to the care provider as "Mommy [C.S.]." She said she just wanted the children to feel safe, welcomed, and loved. Mother noted C.S. was "part of [her] kids, too." Mother recognized the children asked about A.A.'s death during visits, but said she never talked to them about it because she thought she was not allowed to. However, she did want to talk to them about their experience because she felt it would help them heal.

The department argued the juvenile court should terminate parental rights and select a permanent plan of adoption because mother had not proven that an exception applied or that termination of parental rights would be detrimental to the children. The children's attorney agreed the parental-benefit exception did not apply. Mother's attorney argued the court should not terminate parental rights and should select a different permanent plan because the children were benefitting from visits and the children needed ongoing contact with mother so that they could heal with her.

On November 2, 2021, the juvenile court found mother's progress toward alleviating or mitigating the causes necessitating placement had been minimal and that the children were likely to be adopted. The court terminated mother and father's parental rights.

On December 20, 2021, mother filed a notice of appeal.

## DISCUSSION

**I.     Substantial Evidence Supports the Juvenile Court's Implied Finding that the Parental-Benefit Exception to Adoption Did Not Apply**

Mother contends the juvenile court considered improper factors and did not comply with the dictates of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) in determining that the parental-benefit exception did not apply. We disagree.

9.

### A. Legal Principles

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851 (*J.D.*).) "At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of the parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(A)." (*Id.* at p. 297.) "[I]f the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.)

One exception to adoption is the parental-benefit exception, which requires the parent to establish, by a preponderance of the evidence, "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "In other words, '[t]he parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' " (*J.D.*, *supra*, 70 Cal.App.5th at p. 854.) "[T]he focus is the child." (*Caden C.*, at p. 632.) The court may consider " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction

between parent and child, and the child's particular needs.' " (*Ibid*.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.) "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid*.) "[T]he effects [on the child] might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet … a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid*.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633–634.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," and it "should not look to whether the parent can provide a home for the child." (*Id*. at p. 634.) "Even where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Ibid*.) "[T]he section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Ibid*.)

Moreover, "[a] parent's continued struggles with the issues leading to the dependency are not a categorical bar to applying the exception." (*Caden C.*, *supra*,

11.

11 Cal.5th at p. 637.) "[W]hen the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Ibid*.) "The parental-benefit exception can therefore only apply when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency." (*Ibid*.) Thus, "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Ibid*.) However, lack of progress is not irrelevant. "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Ibid*.) "Conversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" … effect' on them." (*Id*. at pp. 637–638.) "In both scenarios, the parent's struggles speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent." (*Id*. at p. 638.) They "may also be relevant to the detriment from terminating parental rights." (*Ibid*.)

On review, the first two elements are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id*. at p. 640.) The third element is reviewed for abuse of discretion. (*Id*. at p. 641.) A court abuses its discretion only when it " 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421.) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no

12.

authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)

**B.      Analysis**

In ruling at the section 366.26 hearing, the juvenile court went over the department's adoption assessment on the record, and then stated it read and considered all of the department's reports and took judicial notice of the court file. The court then found the children were likely to be adopted and terminated parental rights. The juvenile court did not expressly address the parental-benefit exception, but we note that it was not required to do so. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [there is no requirement "that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception"].) "[A]lthough a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it was not a legal requirement in this instance." (*Ibid.*) We also note that *Caden C.* was decided in May 2021, approximately five months before the juvenile court's section 366.26 ruling. " 'In the absence of evidence to the contrary, we presume that the court "[knew] and [applied] the correct statutory and case law." ' " (*People v. Jones* (2017) 3 Cal.5th 583, 616.) Because the juvenile court did not expressly address the parental-benefit exception, there is no evidence it considered improper factors. The record shows the court's statements regarding "the strength and bond between the children, parent and the caretaker" applied to the adoption assessment. Thus, we presume the court applied the correct law.

As we shall discuss, substantial evidence supports the juvenile court's implied finding that the parental-benefit exception did not apply. Concerning the first element— regular visitation and contact—it is questionable whether mother satisfied this element. In September 2019, mother was ordered to participate in therapeutic supervised visits with the children but never scheduled any visits. She then participated in supervised visits in October 2019 for approximately one month and then stopped going. She was

13.

again consistent in January 2020. By the time the section 366.26 addendum report was written in May 2021, the department reported mother had been visiting the children consistently. Therefore, we acknowledge there was evidence from which the court could have concluded mother visited regularly.

In regard to the second element—whether the children would benefit from continuing their relationship with mother—the evidence did not show the children had a substantial, positive, emotional attachment to her. (See *J.D.*, *supra*, 70 Cal.App.5th at p. 854.) The juvenile court was allowed to consider the children's ages and the portion of their lives spent in mother's custody. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) When the current dependency proceedings began, Daniel A. was five years old and An.A. was four years old. By the time of the section 366.26 hearing, Daniel A. was seven years old and An.A. was six years old. Between the prior Los Angeles County dependency case and the current case, the children had spent approximately four-and-a-half years in out-of-home care. Thus, the children had spent a significant portion of their lives outside of mother's care. The court was also allowed to consider how the children felt about, interacted with, and talked about their mother. (*Caden C.*, at p. 632.) In this case, the children enjoyed visiting with mother. An.A. expressed during visits that she did not want calls to end because she loved her. There were times when Daniel A. also had a difficult time separating at the visits. However, more recently Daniel A. did not want to participate in visits. By mother's own account, Daniel A. did not want to talk to her sometimes. Even though the children generally enjoyed visiting with mother, they seemed to be hesitant about the relationship. When asked how they would feel about living with mother, An.A. would not answer, and Daniel A. stated he did not want to live with her. Neither of the children included her in their " 'safe house,' " or wanted their infant brother to live with her. Daniel A. was afraid his infant brother would die if he were to go live with her and An.A. said it would be " 'bad.' " Overall, the department described mother's relationship with the children as that of a " 'friendly visitor.' " (See

14.

*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate"].) Moreover, An.A. told mother she wanted her to go live with them at C.S.'s house and that C.S. would clean, cook, and make a room for her. An.A.'s statement indeed suggests she saw mother as a friendly visitor. Thus, the second element was not satisfied.

Finally, as to the third element—whether termination of parental rights would be detrimental to the child—there is no evidence showing that the bond between mother and the children was so strong that it would outweigh " 'the security and sense of belonging a new family would confer.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Accordingly, the juvenile court acted within its discretion in rejecting application of the parental-benefit exception.

## II. Substantial Evidence Does Not Support the Juvenile Court's ICWA Finding

Mother contends the juvenile court's ICWA finding was not supported by substantial evidence because the record does not reflect that known relatives were asked about possible Indian ancestry, or that the department asked child welfare services in Los Angeles County about findings in prior dependency proceedings. We agree.

### A. Additional Background Information Pertaining to ICWA

On the day the petition was filed, father completed a Parental Notification of Indian Status form (ICWA-020) and checked the box stating he had no Indian ancestry as far as he knew. That same day the social worker completed the Indian Child Inquiry Attachment forms (ICWA-010(A)) for both children, stating the children did not have known Indian ancestry.

The detention report stated ICWA did not apply because mother and father reported they did not have Indian ancestry. At the detention hearing, the juvenile court confirmed with mother and father that they each completed ICWA-020 forms and

checked the box indicating they had no known Indian ancestry. Both mother and father agreed.[6]

At the jurisdiction and disposition hearing on February 10, 2020, the juvenile court found ICWA did not apply.

On March 12, 2020, the department conducted an updated ICWA inquiry for mother and she reported she did not have Indian ancestry. The department was unable to conduct an updated inquiry for father as his whereabouts were unknown.

## B.    Legal Principles

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) "ICWA provides that '[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.' " (*In re A.R.* (2022) 77 Cal.App.5th 197, 203 (*A.R.*); 25 U.S.C. § 1912(a).) "This notice requirement, which is also codified in California law [citation], enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding. " (*In re Isaiah W.*, at p. 5.)

"In California, section 224.2 'codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs].' " (*A.R.*, *supra*, 77 Cal.App.5th at p. 204.) "[S]ection 224.2,

---

**6**    The record only contains a copy of father's ICWA-020 form.

16.

'creates three distinct duties regarding ICWA in dependency proceedings.' " (*In re H.V.* (2022) 75 Cal.App.5th 433, 437 (*H.V.*).) "First, section 224.2, subdivision (b), requires the child protective agency to ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' " (*In re J.C.* (2022) 77 Cal.App.5th 70, 77 (*J.C.*).) "Although commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' (§ 224.2, subd. (a)) and continues throughout the dependency proceedings." (*Ibid.*) "Second, if the court or child protective agency 'has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child,' the court and the Department 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' " (*Id.* at p. 78, fn. omitted.) "Third, if the further inquiry ' " 'results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.' " ' " (*Ibid.*)

" ' " 'The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.' " [Citation.] "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." ' " (*J.C.*, *supra*, 77 Cal.App.5th at p. 78.) The juvenile court may not "find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [child protective agency] inquiry that is not proper, adequate, or demonstrative of due diligence." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408.)

" '[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.' " (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.) "Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)

### C.  Analysis

Section 224.2, subdivision (b), required the department, as part of its initial inquiry, to inquire of the children's extended family members regarding possible Indian ancestry. "Under both ICWA and California law, ' "extended family member[s]" ' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' " (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; 25 U.S.C. § 1903(2); § 224.1, subd. (c).)

The record reflects that the department interviewed three maternal relatives in October 2019—a maternal uncle, maternal aunt, and maternal cousin. Additionally, the department contacted various maternal family members to assess them for placement and an "aunt Liliana" came forward as a result of the department's family finding efforts. A maternal uncle and maternal niece were present at the detention hearing. Father also provided contact information for a paternal cousin to be assessed for placement. Nothing in the record suggests anyone in the department asked these family members about possible Indian ancestry. (See *H.V.*, *supra*, 75 Cal.App.5th at p. 438 [child protective agency's "first-step inquiry duty under ICWA and state law was broader" than simply asking the parents about possible Indian ancestry, "requiring it also to interview, among others, extended family members"].) Neither is there any evidence in the record that

shows the juvenile court inquired about the department's efforts. (See *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431 ["[A] juvenile court errs in making a finding ICWA does not apply to the proceedings without first ensuring that the Department has made an adequate inquiry under ICWA and California law, and if necessary, the court must continue the proceedings and order the Department to fulfill its responsibilities."].)

"[T]he Courts of Appeal are divided as to whether a parent must make an affirmative showing of prejudice to support reversal where the Department failed fully to perform its initial duty of inquiry." (*In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 433.) "The published cases seem to fall into three groups: the first concludes that the conceded error warrants reversal in every case because the duty to inquire was mandatory and unconditional." (*A.R.*, *supra*, 77 Cal.App.5th at p. 205; see, e.g., *H.V.*, *supra*, 75 Cal.App.5th at p. 438; see also, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542, 556.) However a "rule establishing automatic reversal without any reason to believe Native American heritage exists would potentially reward parental gamesmanship and undermine the policy favoring prompt resolution of juvenile dependency cases. It also potentially runs afoul of the constitutional requirement that judgments can only be reversed on appeal in cases where a manifest miscarriage of justice has been shown." (*A.R.*, at p. 206.)

"The second group concludes that the error does not warrant reversal unless a 'miscarriage of justice' is demonstrated to have occurred as a consequence of the failure to inquire about Native American heritage." (*A.R.*, *supra*, 77 Cal.App.5th at p. 205.) "These cases would allow a parent to make an offer of proof on appeal, showing there is reason to believe Native American heritage exists." (*Ibid.*) Absent such a showing, judgment would be affirmed. (*Ibid.*) But this rule "effectively shifts the agency's unconditional statutory burden to the parents in cases where the agency has failed to fulfill it." (*Id.* at p. 206.)

19.

"The third option is the self-described 'middle ground' approach taken in [*In re Benjamin M.* (2021) 70 Cal.App.5th 735], in which the appellate court would determine, on a case by case basis, whether the record reflects there are known relatives identified by the child welfare agency, who appear to have been able to shed light on the issue of Native American heritage. *Benjamin M.* held that the failure to inquire would be reversible error if 'there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child.' " (*A.R.*, *supra*, 77 Cal.App.5th at pp. 205–206.) *Benjamin M.* rejected the idea that an appealing parent had to make an offer of proof about the child's Indian ancestry to demonstrate prejudice. (*Benjamin M.*, at p. 745.) Moreover, "*Benjamin M.* rejected an approach that would require reversal in all cases where the agency erred, explaining: 'There are cases where … it was obvious that additional information would not have been meaningful to the inquiry. This might occur where the evidence already uncovered in the initial inquiry was sufficient for a reliable determination.' " (*J.C.*, *supra*, 77 Cal.App.5th at p. 81.) For example, additional information would not be meaningful where the department had already made an undisputed and unchallenged finding that ICWA did not apply to a dependent child's full siblings. (*In re Charles W.* (2021) 66 Cal.App.5th 483, 490 [department made adequate initial inquiry where there was an undisputed and unchallenged finding that ICWA did not apply to two older siblings].) The case before us does not fit into such a category. Nothing in the record suggests the department reached out to child welfare services in Los Angeles County to ask about prior ICWA findings.

In this case, there was readily obtainable information available to the department as it had contact with multiple family members throughout the proceedings. The department should have asked these known family members about the children's Indian ancestry status. Although mother and father denied having Indian ancestry, "it is not uncommon for parents to mistakenly disclaim (or claim) Indian ancestry." (*J.C.*, *supra*,

77 Cal.App.5th at p. 81.) Thus, we conclude the juvenile court's finding that ICWA did not apply was not supported by substantial evidence.

## DISPOSITION

The November 2, 2021, orders terminating mother's parental rights are conditionally affirmed. We remand for the department and the juvenile court to comply with the inquiry requirements of ICWA and California law. If the court finds the children are Indian children, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in compliance with ICWA and related California law. If not, the court's original section 366.26 orders will remain in effect.